FREEPORT SULPHUR COMPANY ET AL. v. AMERICAN SULPHUR ROYALTY COMPANY OF TEXAS

No. 4508.    Decided May 23, 1928.
(6 S. W., 2d Series, 1039.)

*W. T. Andrews, C. P. Northrop, C. R. Wharton, Jno. A. Mobley, S. H. German, Palmer Bradley, Baker, Botts, Parker & Garwood* and *Andrews, Streetman, Logue & Mobley*, for plaintiff in error.

Implied covenants are not favored by the law and are never imputed to a contract except as a legal necessity for the purpose of effectuating the plain, clear and unmistakable intention of the parties.

The reasonable, fair and unmistakable construction to be placed upon the contract between Simms and Swenson & Sons and the deed of conveyance, arrived at from a consideration of all the terms of same, is that it constitutes a conveyance in fee, for a valuable consideration, of said lands, with the agreement that same shall be held subject to the payment of royalties on sulphur when same is mined and produced; and same is not in any sense a contract for development of said lands for sulphur upon the basis of anticipated royalties. Grass v. Big Creek Development Co., L. R. A., 1915 E., 1057, 84 S. E., 750; Morrison-De Soto's Oil and Gas Rights, 71; Griffin v. Bell, 202 S. W., 1034; Greenwood & Tyrell v. Helm, 264 S. W., 221; Hawkes v. Taylor, 70 Ill. App., 255; Feather v. Baird (West Va.), 102 S. E., 294; Carper v. United Fuel Gas Co., 89 S. E., 14; Allen v. Colonial Oil Co., 115 S. E., 842.

When there has been an express covenant pertaining to a particular matter about which the parties are contracting, there is no room for an implied covenant relating to the same matter, and none will be created by law. The contract and conveyance under which plaintiff in error holds having expressly provided for the building and putting in operation of a plant of one unit, of the kind described, and thus clearly evidencing the intention of the parties as to the matter of development of the lands for sulphur, this excludes the idea of any additional covenant relating to the matter of development not expressly written in the contract, and no general covenant

for the development of the land in good faith and with reasonable diligence will be implied. Burt v. Deorsan, 227 S. W., 354; Humble Oil & Refining Co. v. Strauss, 243 S. W., 528; Nabors v. Producers Co., 74 So., 527; Becker v. Submarine Oil Co., 204 Pac., 245; Greek v. Willie, 109 Atl., 529; Aye v. Philadelphia, 44 Atl., 555; Grimes v. Goodman, 216 S. W., 204; Stoddard v. Emery, 18 Atl. (Penn.), 339; Crouch v. Fowle, 9 N. H., 219.

Plaintiff in error having installed four plants instead of one, as provided for in the contract, and having for many years developed the sulphur in a manner far in excess of the contract requirement, during which time defendant in error was paid royalties exceeding by five times the amount it would have received if development had been confined to a one unit plant, as originally contracted, such payments will be recognized as covering the period of suspension, and if covenant to operate said one unit plant in good faith and with reasonable diligence could be implied, it conclusively appears that such covenant was not breached.

If the contract and conveyance between the parties in this case created an implied covenant for development of the land for sulphur, then such covenant was not necessarily one for continuous development, but merely contemplated such development as, under all the circumstances and conditions, was in the judgment and discretion of plaintiff in error mutually profitable and beneficial to the parties; and in the absence of allegations and proof that plaintiff in error had abused this discretion, or was guilty of fraud and bad faith, it appearing that there was no such delay in operations as amounted to an abandonment of the enterprise, the issue as to the breach of such implied covenant (if any) was not raised by the pleadings and the proof.

The undisputed evidence showed that the two periods of suspension of actual production complained of by defendant in error were such suspensions as were justified from the standpoint of good business judgment and economical administration of the business enterprise, and that in suspending actual production (but not operations), as was done, plaintiff in error acted in good faith and in the exercise of sound business judgment as to what was right and proper under all the circumstances and conditions; and there was therefore no proof raising the issue of a breach of an implied covenant (if any) for development in good faith and with reasonable diligence. Benavides v. Hunt, 79 Texas, 383; L. R. A., 1915 E, 1057; Allen v. Colonial Oil Co., 115 S. E., 844; Texas Pacific Coal

& Oil Co. v. Bruce, 233 S. W., 535; Caddo Oil & Mining Co. v. Producers Oil Co., 134 La., 701.

Even if there was a general implied covenant to develop the properties in question for sulphur in good faith and with reasonable diligence, yet the anticipated royalties were to be a part consideration for sulphur removed from the land, when removed, and were not anticipated profits, hence, until sulphur was removed, defendant in error suffered no loss, but was merely subjected to delay in receiving that which it will receive in the future; therefore, the proper measure of damage for any unreasonable suspension of operation is legal interest on such royalties as defendant in error might have received under the terms of the contract if there had been no unreasonable delay, as the sulphur remained in the ground, and defendant in error, under the contract, would receive royalties thereon when mined. Such was held to be the proper rule in the ably considered case of Grass v. Big Creek Development Co., 75 W. Va., 719; 84 S. E., 750; L. R. A. 1915 E 1057, which is apparently the only case which has been decided that fits the facts here involved.

Implied covenants are those which are imputed in law as having been necessarily intended by the parties from the nature of the transaction or the words used, and which the law presumes would have been stated by them in express language if deemed necessary or if the matter had been called to their attention. They are never read into a contract unless the parties have omitted to insert covenants in the writing. Belle-Meade Lumber Co. v. Turnbull, 87 S. E., 382; Hawkes v. Taylor, 70 Ill. App., 255; Munsey v. Marnett Oil & Gas Co., 113 Texas, 212; Allen v. Colonial Oil Co., 115 S. E., 842.

As to the right of plaintiff in error to use its sound judgment and a reasonable discretion in the matter of suspending operations: What we have maintained and what has not been controverted by counsel is that in the administration of a large commercial enterprise the discretion of the operator to determine what is a reasonable development is absolute, subject to be brought into question in a judicial proceeding under proper averments. Blue Creek Development Co. v. Howell, 133 S. E., 699; Weisant v. Follett, 17 Ohio App., 271; Caddo Oil & Mining Co. v. Producers Oil Co., 64 So. 690.

*W. H. Wilson, W. S. Sproles, W. T. Williams,* and *Presley K. Ewing,* for defendant in error.

In the absence of a provision to the contrary in the contract, the law implies a covenant on the part of the grantee or lessee of mineral

lands to begin operations within a reasonable time and continue to work the mine in a proper manner and with reasonable diligence, so that the grantor or lessor may receive the compensation or income contemplated when the grant or lease was made, where, under the terms of the grant, the right to mine is granted in consideration of the reservation of a certain portion of the product (or of royalties proportioned to the production) to the grantor. Corpus Juris, Vol. 40, Mines and Minerals, pp. 1020–1021, Notes 43–44–45 and cases; Sharp v. Wright, 28 Beav., 150, 54 Reprint English Cases p. 323; Munsey v. Marnett Oil & Gas Co., 199 S. W., 686–689–690, approvingly followed by the Supreme Court in a recent decision, 254 S. W., 311–313; Benavides v. Hunt, 79 Texas, 383–394–396; Grubb v. McAfee, 109 Texas, 527–530–535, and cases cited; J. M. Guffey Petroleum Co. v. Oliver, 78 S. W., 884–888; J. M. Guffey Petroleum Co. v. Jeff Chaison Townsite Co., 107 S. W., 609–612; Brewster v. Lanyon Zinc Co., 140 Fed., 812–815; Kleppner v. Lemon, 176 Pa., 502; Bryan's Law of Petroleum & Natural Gas, Sec. 215, p. 189 citing Koch's Appeal, 93 Pa., 442; Bryan's Law of Petroleum & Natural Gas, Sec. 224, p. 196; Thornton's Oil & Gas, Vol. 1, Sec. 98, p. 155; Ray v. Gas Co., 138 Pa. St., 571, 20 Atl. 1065; Harris v. Ohio Oil Co., 157 Ohio St., 118–127, 28 N. E., 502–505.

A reasonable, diligent production in good faith means production in the interest of the royalty owner as well as in the interest of the operator: Iams v. Carnegie Natural Gas Co., 145 Atl., 54–55; Glasgow v. Glasgow, 152 Pa., 48, 25 Atl., 232.

The principle that the law implies an obligation in the mine operator (unless excluded by the express terms of the writing) to operate the mine with reasonable diligence, to the end that the royalties on operation may be paid as agreed, applies equally whether the operator is the grantee in a deed or the lessee in a mineral lease, for in Texas in every mineral lease there being an exclusive appropriation of the mineral which in a contingency may last forever, the instrument is a conveyance of the legal fee title to a mineral as land and in its essentials not different from a deed: Texas Co. v. Davis, 254 S. W., 304; Robinson v. Jacobs, 254 S. W., 309; Munsey v. Marnett Oil & Gas Co., 254 S. W., 311; Thomason v. Ham, 254 S. W., 316.

The principle that the law implies, in the absence of an express provision to the contrary, an obligation in the grantee of mineral land, and in his assigns, to operate the mines with reasonable diligence in the interest of the royalty owner as well as of the operator,

where the conveyance is made in consideration of royalties proportioned to production and agreed to be paid by the operator, applies equally where the obligation to pay royalties is the sole consideration of the deed and where there is also a money or other consideration additional to the agreement to pay royalties on production; for if the agreement to pay royalties be a material and integral consideration of the deed the law certainly has no bias against the royalty part of the consideration in a sale of what is mineral land, but in the interest of justice contemplates the reasonable development of the minerals and payment of the royalties thereon; particularly is this true in the instant case. Emery v. League (Civ. App.), 172 S. W., 603–607. Cash consideration paid equal to the full value of the land if not mineral; Fisher v. Crescent Oil Co., 178 S. W., 905–906–907. Cash consideration of $6,400 paid. Implied obligation to mine and operate during continuance of lease (178 S. W., 907); Munsey v. Marnett Oil & Gas Co., 254 S. W., 313–314. Holding that in Fisher v. Crescent Oil Co. a vested estate in the minerals passed, burdened inseparably with a continuing duty to mine and operate the land for minerals (254 S. W., 313–314).

To place the decision in the operator, of whether he has operated the mine with reasonable diligence under the obligation imposed on him by law, would make the operator the judge in his own case; and the rights of the royalty owner, given him by law, to development of the minerals with reasonable diligence by the operator, would be of little value if the operator is made the judge of his own legal obligation—a situation anomalous in the English and American law and contrary to the primary conceptions of justice, that the operator should be judge in his own case and that the royalty owner should hold his rights, conferred by law, at the will and decision of the operator who might have one or a number of adverse interests. Texas Co. v. Ramsower (Com. of App., decision Section A, opinion filed February 29, 1928), 7 S. W., 2d, 872; Brewster v. Lanyon (U. S. App.), Fed., 801–813–814; Daughetee v. Ohio Oil Co., 151 Ill. App. 101, 263 Ill., 518, 105 N. E., 308; Munsey v. Marnett Oil & Gas Co., 199 S. W., 686–689; Grubb v. McAfee, 109 Texas, 527, 212 S. W., 464; Jeff Chaison Townsite Co. v. Guffey Petroleum Co., 107 S. W., 609; Kleppner v. Lemon, 176 Pa. St., 502, 35 Atl., 109.

A covenant in a mining lease or grant stipulating for royalties to be paid quarterly, based on current production, is by necessary implication a covenant for quarterly production—that is, for practically

continuous production. The language used in this covenant giving to it its natural meaning and such implied meaning as necessarily inheres in the words used, leaves nothing to implication of law but the degree of diligence to be used by the operator in carrying out his covenant of production. To this there is but one answer—the law will never consider a diligence that is less than reasonable or that is not in good faith in the interest of the party for whose benefit the covenant of production is made. Munsey v. Marnett Oil & Gas Co., 199 S. W., 689; Sharp v. Wright, 28 Beav., 150, 54 Eng. Reprint 323; Jarvis v. Tomlinson, 1 H. & N., English Reprint, Vol. 156, p. 1173; Fisher v. Crescent Oil Co., 178 S. W., 95–96–97; Munsey v. Marnett Oil & Gas Co., 254 S. W., 313–314; Harris v. Oil Co., 157 Ohio St., 28 N. E., 502–505.

Plaintiff will not be held to have cut itself off from its legal rights to a reasonable production of sulphur by language used in the contract, unless that language, fairly construed, means in law that Sec. VII was intended to be (construed according to its language and under the circumstances surrounding the transaction) a stipulation governing production. Especially is this the case as it is the policy of the law where the terms of the agreement will permit of it, to so construe the agreement as to permit development and to prevent delay and unproductiveness. (40 Corpus Juris, paragraph 666, p. 1053; Logan Natural Gas Co. v. Great Southern Gas Co., 126 Fed. 623, 61 C. C. A., 359; Huggins v. Daley, 99 Fed., 606, 40 C. C. A., 12, 48 L. R. A., 320; Donaldson v. Josey Oil Co., 106 Okla., 11, 232 Pac., 821; Carter v. Blackwell Oil Co., 83 Okla., 243, 201 Pac., 252; Garfield Oil Co. v. Champlain, 78 Okla., 91, 189 Pac., 514; Custer v. Fortuna Oil Co., 77 Okla., 257, 187 Pac., 248; Provant v. Sealy, 77 Okla., 244, 187 Pac., 235; Curtis v. Harris, 76 Okla., 226, 184 Pac., 574; New State Oil Co. v. Dunn, 75 Okla., 141, 182 Pac., 514, Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va., 583, 42 S. W., 655.)

Sec. VII would seem naturally to have been intended for a test of the Frasch process, as it could not be certainly known that that process would successfully work in the field until it was tried.

The rule is general in the occurrence in a lease or mining grant of a provision which, fairly construed, is a provision for a test or exploration plant—that such stipulation will not be held to limit or affect the implied covenant of the law 'for a reasonably diligent production in good faith, and will not be permitted to overrule or impair an express provision in the contract applying to production (where

there is one), but will be confined to the purpose for which it was intended. Texas Co. v. Ramsower (Com. App., decision Feb. 29, 1928), 7 S. W., 2d, 872; Munsey v. Marnett Oil & Gas Co., 199 S. W., 686–690; Grubb v. McAfee, 109 Texas, 527, 530, 535; J. M. Guffey Petroleum Co. v. Oliver, 79 S. W., 884, 885, 888; Emery v. League, 72 S. W., 603.

Mr. Justice PIERSON delivered the opinion of the court.

So far as is necessary to our opinion, we quote the essential facts of this case from the opinion of the Court of Civil Appeals as follows:

"On November 30, 1911, E. F. Simms sold and agreed to convey to E. P. Swenson and S. A. Swenson of the firm of S. M. Swenson & Sons, a large quantity of land in Brazoria County, described in an attached exhibit 'A,' in part represented by stock and in part to be acquired under purchase options, stipulating to convey the same by general warranty deed of even date to George Hamman, in trust for said Swenson & Sons, their nominee or nominees, heirs, executors or assigns. The contract contained these provisions:

" 'III. For all of aforesaid lands and aforesaid stock * * * so sold and agreed to be conveyed by the said Simms subject to the royalty provision in paragraph IX hereof, said Swenson & Sons have paid and agreed to pay Four Hundred and Fifty Thousand ($450,000) Dollars * * *

" 'VII. As a further consideration for this contract and the performance thereof by said Simms, said Swenson & Sons agree that they, their heirs, executors, administrators or assigns, shall within one (1) year from June 1st, 1912, erect or cause to be erected and put in operation upon the land mentioned and described in aforesaid exhibit "A" a complete plant consisting of one unit in accordance with the process operated at the Union Sulphur Works in Louisiana, under the expired Frasch patent. Such plant shall be located on aforesaid land at such place as said Swenson & Sons, or their heirs, executors, administrators or assigns, may think best and most expedient.

" 'IX. It is further agreed that upon the development of said property for sulphur and so long as said property or any part thereof is operated as sulphur producing property, the operator or operators of said property shall pay to said Simms, his heirs, executors, administrators or assigns, as royalty, seventy-five (75c) cents per ton for each and every ton of sulphur mined or taken from said property

or any part thereof, and in addition thereto shall pay to him or them for the first Two·Hundred Thousand tons of sulphur so mined or taken one ($1) dollar per ton.  This covenant is intended to bind each and every operator mining or taking sulphur from said property or any part thereof, but such operator or operators only.  Quarterly settlements covering royalty production shall be made.  Said Simms, his heirs, executors, .administrators and assigns, shall have full opportunity from time to time to verify the output of sulphur therefrom and amount of royalty that may be due him, and to visit the property at any time for the purpose, and to be fully advised as to the development thereof.'

"The contract was consummated to the satisfaction of the parties as concerns the sale and purchase of the lands.

"Simms, on the same day, November 30, 1911, pursuant to the contract, made to George Hamman, trustee, the conveyance stipulated for, which contained this provision:

" 'The above described property is conveyed subject to the royalty upon any and all sulphur that may be mined or produced therefrom, in favor of E. F. Simms, his heirs, executors, administrators, and assigns, save and except to this extent: No royalty is retained except as to such property as lies south and west of the hereinafter mentioned line, (here follows descriptive location of the line).  The property upon which such royalty is payable and which property is now transferred subject to such sulphur royalty, lies to the south and west of the line to be run as above indicated, and the property exempted from such sulphur royalty lies to the north and east of the line so to be established.'

"Simms made two other general warranty deeds, of October 24, 1912, both to Freeport Sulphur Company, for specified tracts of land, each containing this provision:

" 'The land above described is conveyed by the grantor herein with a reserved royalty on all sulphur that may be produced from said land hereafter by the grantee, its successors or assigns, the amount, form and time of payment of the royalty to be the same as was stipulated to be paid to E. F. Simms by S. M. Swenson & Sons, on certain other lands made subject of a certain agreement of date November 30, 1911, between S. M. Swenson & Sons and E. F. Simms, which contract is hereby expressly referred to.  It being understood that the royalty herein reserved shall remain and continue a first lien on all the sulphur which may be hereafter produced from said land until such royalty is paid.'

"By mesne conveyances and agreements, the title and interest acquired pursuant to the contract of sale and subsequent deeds, as concerns the sulphur properties in question in which royalties were reserved as aforesaid, became regularly vested in the sulphur company, subject to the obligation on its part to pay the specified reserved royalties to the plaintiff, the royalty company.

"Similarly, by mesne transfers and agreements, the title and interests of the vendors, E. F. Simms and his associates in interest, H. T. Staiti, John Hamman and George Hamman, under the sale and conveyance pursuant to said contract of purchase by S. M. Swenson & Sons, became vested in the royalty company, with the right to the specified reserved royalties, to be paid to it by the sulphur company.

"The complete plant consisting of one unit in accordance with the Frasch process, which it was stipulated should be erected and put in operation within one (1) year from June 1st, 1912, was erected and put in operation within the specified time, and other plants were later erected and put in operation, four in all, as the demands of the market required, and the property was continuously developed, barring a few days in the early operations, until the shutdown on April 1st, 1921, and after resumption of operations, June 2, 1922, until the second shutdown, which was January 22, 1924, and which continued up to the time of the trial."

After the second shutdown mentioned above, the Royalty Company sued the Sulphur Company "to recover damages for its failure to develop and operate the sulphur mines in good faith and with reasonable diligence, and to require it to proceed with and continue such development and operation in good-faith and with reasonable diligence," in order that it might receive its royalty. Its cause of action was based on an alleged implied covenant on the part of the Sulphur Company to develop and operate the sulphur mines with reasonable diligence, a breach of that covenant, and for resulting damages. The defense of the Sulphur Company was that it had acquired fee simple title to the property under warranty deeds, for a large and valuable consideration, to-wit: $450,000, and though it was under obligation to pay to defendant in error, Royalty Company, 75c on each ton of sulphur taken from the ground, it was under no obligation or implied covenant to develop or operate the property at all; that there was a provision for the erection and putting in operation of a one-unit plant under the terms of Article VII of the contract; that such a plant of one unit had been erected and put in operation, which was a full compliance with that provision of the

contract, and that it was under no obligation or implied covenant to operate such plant, for reasons that will be stated later. It defended further on the ground that during a number of years previous to the shutdown it had erected and operated four such plants, which was a complete offset to the present claim for failure to operate with reasonable diligence; and also that at the time of the shutdown it had large quantities of sulphur unsold and in storage, and for that reason it was not chargeable with lack of diligence in continuing operation. The district judge instructed a verdict for the Sulphur Company. Upon appeal the Court of Civil Appeals reversed the judgment of the District Court and remanded the cause to that court for another trial. 276 S. W., 448. The Court of Civil Appeals held that the Sulphur Company was under an implied covenant to fully develop the land for sulphur "in good faith and with reasonable diligence." It found the measure of damages for failure to reasonably operate the sulphur mines to be an amount which the jury should find the owner would have received in royalties if the mines had been operated during the time they found operation was unreasonably suspended, together with six per cent interest per annum thereon. Writ of error was granted, and the cause was transferred to Section "B" of the Commission of Appeals, but later was withdrawn from the Commission and taken under submission by the Court.

The interesting and very important subject of implied covenants is presented in this case, and also the important question of the proper measure of damages.

The court cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties in the contracts made. Before a covenant will be implied in the express terms of a contract, and in some cases in view of the customs and practices of the business to which the contract relates, it must appear therefrom that it was so clearly in the contemplation of the parties as that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to imply such covenant in order to give effect to and effectuate the purpose of the contract as a whole. The Supreme Court of West Virginia, in the case of Grass v. Big Creek Development Company, 75 W. Va., 719, 84 S. E., 750, L. R. A., 1915 E, 1050, states the rule as follows:

"Implied covenants can only be justified upon the ground of legal necessity. Such necessity may arise out of the terms of the contract or out of the substance thereof. One absolutely necessary to the operation of the contract and the effectuation of its purpose is necessarily implied, whether inferable from any particular words or not. It is not enough to say it is necessary to make the contract fair, or that it ought to have contained a stipulation which is not found in it, or that, without such covenant, it would be improvident or unwise or would operate unjustly; for men have the right to make such contracts. Accordingly, courts hesitate to read into contracts anything by way of implication, and never do it except upon grounds of obvious necessity."

The rule is well stated in Corpus Juris as follows:

"A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face. In order that an unexpressed term may be implied the implication must arise from the language employed in the instrument or be indispensable to effectuate the intention of the parties." 13 C. J., p. 558.

"While there can be no implied covenant as to a matter specifically covered by the written terms of the contract, yet covenants may be implied from the language of express covenants in order to effectuate their clear intention and give them their full and beneficial operation." 15 C. J., p. 1214.

In England it seems no obligation to work a mine is implied merely because a royalty is reserved. MacSwinney on Mines, 2d Ed., p. 242, 5th Ed., p. 139, and cases cited; Merrill, Covenants Implied in Oil & Gas Leases, p. 257. It is said in MacSwinney on Mines, 2d Ed., p. 242: "A lessee cannot be compelled to work on the mere grounds that the mine has been included in the demise, and a royalty reserved in respect of it;" and there is "no obligation to work in absence of covenant." However, the American courts have liberalized the rule, especially in sales of minerals and mineral rights in oil and gas leases, and have found an implied covenant for diligent and reasonable development and operation in leases which make the lessor's compensation depend upon development and operation.

There are four important issues to be determined: (1) Whether in the contract of the parties an implied covenant exists to fully develop the property and continuously operate the mines and produce

sulphur upon which a royalty should be paid; (2) whether the provision, in Paragraph VII of the contract of purchase and sale, for the erection and operation of a one-unit plant expressed the agreement of the parties as to development, and is there an implied covenant for the operation of such plant with reasonable diligence, or whether it was intended that such a plant should be erected for the purpose of testing the process under the Frasch patent, and that a covenant should be implied for the full development of the property for the production of sulphur; (3) the rule by which the sufficiency of development or operation for production of sulphur should be measured in this case—that is, whether the rule of good faith on the part of the Sulphur Company or the rule of reasonable diligence is the correct rule; (4) the proper rule for measuring the damage for failure to develop and operate for the production of sulphur.

Plaintiff in error, the Sulphur Company, contends that this being an absolute sale of the property for a large and valuable consideration, in which the fee simple title passed to the purchaser, there could be no implied covenant for development or operation for the production of sulphur, even though the contract and deeds provide for the payment of 75c per ton on all sulphur produced when taken from the ground and for an additional $1 per ton on the first 200,000 tons produced. It further contends that the provision of Paragraph VII of the contract that a one-unit plant be erected and put in operation does not make it necessary to find that an implied covenant exists to operate said one-unit plant, but that it was within the contemplation of the parties that the $450,000 paid for the property, and the large cost of constructing a one-unit plant, would be sufficient assurance to the grantor, the Royalty Company, that sulphur would be produced, because the Sulphur Company would have such large amounts of money invested in the property that it could depend upon the self-interest of the Sulphur Company to operate and produce sulphur upon which it should receive its royalties.

The defendant in erorr, Royalty Company, insists that the one-unit plant was simply for the purpose of testing the process under the Frasch patent; that the contract is silent as to development, and that the principal consideration to it was the royalties to be received, and that an implied covenant exists for full development of the property and operation of mines for the production of sulphur, in order that it may receive the royalties provided for.

It appears from the contract that the consideration to grantors was the $450,000 cash to be paid, a royalty of 75c per ton to be paid

on each ton of sulphur taken from the land, and an additional $1 per ton on the first 200,000 tons of sulphur produced. It is hardly proper for the Court to surmise whether the *principal* consideration to the grantor for the conveyance was the $450,000 paid or was the royalty of 75c per ton on all sulphur produced and the $1 per ton on the first 200,000 tons of sulphur to be mined, or to adjudicate that fact on testimony of the interested parties subsequently given and in the light of subsequent events. It is apparent, however, that the royalty contracted for and the $1 per ton on 200,000 tons on first production was at least a consideration specifically provided for. If this part of the consideration thus provided for, and evidently considered by the parties to be substantial, is to be realized or in any sense received as compensation, development and production are necessary and essential, and a covenant for development and operation of mines must exist in order to give any effect to that part of the contract.

The presence of sulphur in the ground in large quantities was well known to the contracting parties. They had thorough knowledge also of the process used in the Union Sulphur Works at Union, Louisiana. The sale and purchase were made in view of that knowledge. The royalty of 75c per ton on all sulphur produced and the additional $1 per ton on the first 200,000 tons mined were a part of the consideration for the sale of the property, and provision for their realization was made in the stipulation that a complete plant should be erected and put in operation. They were not reservations of an interest in the property, nor a retention of title to a part.

"Where a reservation in a deed cannot be construed as an exception, as where the thing reserved is not a part of that previously granted, it will be construed as an implied covenant on the part of the grantee." 15 C. J., p. 1217.

That the rule of implied covenants has had a special development as applied to the ordinary oil and gas lease does not make its proper application inappropriate to the mining of solid minerals in land acquired under fee simple title, where the terms of the contract of sale makes its application necessary to effectuate the purposes fairly evident in the writings. It really is a matter of interpreting the writings of the parties and ascertaining their intentions therefrom.

We have concluded that no implied covenant exists for the full and general development of the property, as contended for by the Royalty Company, for the reason that the provision in Paragraph VII for the erection of a one-unit plant was an express provision for

development, and negatives an implication for development. In his "Covenants Implied in Oil & Gas Leases," Merrill says:

"It is elementary that an express stipulation upon a matter excludes the possibility of an implication upon the same subject."

The language used in the above mentioned Paragraph VII is not subject to the construction that it applies only to a plant to be erected to test a certain process, but was an express provision for development. It reads:

"VII. As a further consideration for this contract and the performance thereof by said Simms, said Swenson & Sons agree that they, their heirs, executors, administrators or assigns, shall within one (1) year from June 1st, 1912, erect or cause to be erected and put in operation upon the land mentioned and described in aforesaid exhibit 'A' a complete plant consisting of one unit in accordance with the process operated at the Union Sulphur Works in Louisiana, under the expired Frasch patent. Such plant shall be located on aforesaid land at such place as said Swenson & Sons, or their heirs, executors, administrators or assigns, may think best and most expedient."

The language is clear that the Sulphur Company should erect on the property a complete plant of one unit and put it in operation in accordance with the process used in the Union Sulphur Works in Louisiana. There is nothing to indicate that this is merely a test plant, but it is evident that it is to secure the erection and operation of a plant under the approved process of operation as used in a similar field on the Gulf coastal plains. It is our conclusion that this provision that a complete plant of one unit should be erected and put in operation does carry a very necessary implication for continued operation of said plant for the purposes of the contract regarding royalties to be paid to the Royalty Company. The parties having contracted for development, an implied covenant exists for diligent operation for the best advantage and benefit of both.

The rule contended for by plaintiff in error that suspension of operations was a matter wholly within the judgment and sound discretion of the operating party, provided he acted in good faith and that the exercise of such judgment and discretion is conclusive, save and subject only to be brought into question in a judicial proceeding upon proper averments of fraud, is not sound in principle or practice. In his "Covenants Implied in Oil & Gas Leases," from which both plaintiff in error and defendant in error freely quote, Merrill says:

"Rule or· Standard? Granting the recognition of the implied covenants for exploration, for development, for operation and for protection, by what yardstick is the sufficiency of the lessee's compliance therewith to be determined? Obviously there must be some basis for determination and that basis must be applied by the courts. The matter cannot be left to the will of either party to the lease. To leave it to the lessee would be to destroy the implied covenants; to leave it to the lessor would throw open the door to captious and unreasonable demands, burdensome and perhaps disastrous to the lessee."

The correct rule is announced in Brewster v. Lanyon Zinc Co., 140 Fed., 801, wherein Mr. Justice Van Devanter (then circuit judge) said:

"Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

The rule of reasonable diligence is in accord with the weight of authority, and is so clearly correct and applicable to this case that we deem further discussion unnecessary.

We overrule plaintiff in error's contention that it should be credited with the production from the three additional plants during the prior years they were operated as an offset and discharge to defendant in error's demand for production from one complete plant during the period in which plaintiff in error refused to operate any plant with reasonable diligence. The nature of the case and the facts and circumstances do not justify such a holding. The provision that a complete plant of one unit should be erected and put in operation was not exclusive of other plants, and the fact that defendant in error found it profitable to erect and operate additional plants in other years could not abrogate the rule and its duty to exercise reasonable diligence in operating according to the agreement. It was under contractual obligation to operate one complete plant, but had the option to erect and operate as many more as it chose, subject, of course, to the payment of the royalty.

While plaintiff in error was not under a legal duty to develop further than a complete one-unit plant, the fact that it did do so to meet the greatly enlarged demand and for its increased profits does not relieve it of its contractual duty to continue operation of the one-unit plant with reasonable diligence. It would be unreasonable to say that because in the past plaintiff in error had produced more sulphur than the one-unit plant could have produced, it should be

excused from producing sulphur altogether and to cease operating with reasonable diligence. See Corona Coal Co. v. Hendon, 214 Ala., 139, 106 So., 855; Vandalia Coal Co. v. Underwood, 55 Ind. App., 91, 101 N. E., 1047; and Smith v. Godfrey (Tenn. Sup. Ct.), 48 S. W., 303.

Plaintiff in error says that on April 1, 1921, (the date of the first suspension), it had on hand an accumulated sulphur stock of 328,121 tons, or nearly 50,000 tons more than they had mined during the preceding year; that the investment in this accumulated sulphur stock was more than three and one-half million dollars, and this accumulated quantity of sulphur was almost twice as much as they could expect to market in an entire year, and that when it resumed operations in April, 1922, it still had on hand nearly 100,000 tons; that after running at full capacity, at the time of the second suspension about January 31, 1924, it had an accumulated stock of 164,198 tons, and that the two shutdown periods "were under the circumstances entirely reasonable and justified."

On this issue it was shown that other sulphur companies, with much larger stocks, continued to operate; that plaintiff in error had purchased a great sulphur property at Hoskins Mound, fifteen miles from Bryan Mound, and during the suspension periods was actively operating it. It does not appear that to have continued operation at Bryan Mound would have caused economic waste or have failed to have produced good and ample profits. It is a fact issue for a jury to determine whether the suspensions were justified under the rule of diligence announced above.

The parties have presented and urged two rules for measuring the damages in this case. In discussing this issue the Honorable Court of Civil Appeals said:

"No rule for the measure of unliquidated damages can be applied which will fix with exactness the amount of compensation appellant should receive if the Sulphur Company had breached its contract, but this fact will not justify denying it any compensation. All that the law requires in such cases is reasonable certainty."

It held that the Royalty Company should be allowed to recover as the damage suffered by it "the amount which the jury finds the appellant (the Royalty Company) would have received in royalties if the mines had been operated during the time they found operation was unreasonably suspended, with interest at six per cent from the date such royalty would have accrued." This is the just and correct rule, and is supported by the weight of authority. Texas Pacific

Coal & Oil Co. v. Mrs. Suda Barker et al., opinion of this Court delivered today, and authorities therein cited. The Sulphur Company insists that this would result in the Royalty Company receiving double damages, as the sulphur remains in the ground, is available, and the Royalty Company will eventually receive the royalty thereon when it is produced as stipulated in the contract. It says that compensation for the injury done is all the Royalty Company is entitled to, and that the correct and proper measurement in this case "would be interest on the amount of royalties which defendant in error would have received under the contract during the period of suspension."

As applied to the facts of this case, the rule for interest only has much more serious difficulties and objections. Naturally the right to receive interest on the amount of royalty that should have been paid during the suspension periods could not justly be limited to the time of filing the suit or to the date of trial or concluded by the trial, as the damage and loss is a continuing one. As observed by the Court of Civil Appeals:

"It is plain that the interest * * * up to the time of the trial would cover only a small part of the interest lost by appellant (Royalty Company), because when operations are resumed the royalties therefrom will be long past due, and the interest which appellant (Royalty Company) would be entitled to receive thereon would never be received, and this would be true as to all subsequent royalties until the exhaustion of the mines. Appellant (Royalty Company) presents figures based on the continued estimated production of the mines and the time of their exhaustion, which show that the present value of this lost interest would exceed the sum of royalties lost by the suspension and interest thereon up to the date of trial. These figures appear to us to be correct, but, be this as it may, we think the safe rule for compensation is that first stated."

On this issue in this case the Honorable Commission of Appeals, Section B, in recommending the *interest only*" rule, speaking through Judge Powell, says:

"As to the two rules considered, we prefer to apply the *interest only* rule. But, as we have indicated, the objection to that rule is merely one of inconvenience or multiplicity of suits and does not affect the correctness of the measure of damages."

While in the administration of justice it is the purpose of courts to bring litigation to an end and to enter final judgments where possible, and the law abhors a multiplicity of suits, yet for recurring damages recurring suits may be maintained. But a multiplicity of

suits is never encouraged, but is always avoided, where possible. Certainly necessity therefor is never created by the courts.

There was testimony, and we believe acquiesced in by both parties, that at the average rate of production by a complete one-unit plant, as provided in the contract, the probable life of the mines at Bryan Mound would be 400 years; at the average rate of four such plants, probably 60 years.

The interest on royalty that should have been produced and paid would be subject to recovery for a period of time indefinite in nature, until the sulphur in the mine is reduced until only the amount that should have been produced during the suspensions should remain; likewise, for all succeeding wrongful suspensions, if any, each adding to and augmenting the others. Final accounting would be extremely difficult, if not impossible.

Under the contract in this case the Royalty Company is entitled to receive quarterly a royalty of 75c per ton on such output as a complete plant of one unit can produce, operated with reasonable diligence. The Sulphur Company was under contractual obligation to so operate one complete plant, and to pay the royalty thereon quarterly. Therefore, under these contractual conditions, in order that the Royalty Company may receive prompt and full compensation for its loss, and in order to require the Sulphur Company to respond in prompt and full compensation for its wrongful suspension as the law contemplates, we hold the Royalty Company may recover the full amount it was entitled to receive, with interest at the legal rate from the date such royalties would have accrued.

So long as the Sulphur Company breaches or violates its contractual duty to operate one plant, the Royalty Company may recover its compensation for the full amount of sulphur that should have been produced as contemplated in the contract. The Court would not be understood as determining that under no circumstances and conditions would plaintiff in error be allowed in the future to withdraw the quantity of sulphur on which royalties have been recovered without being required to again pay royalties thereon. On the retrial, or thereafter, plaintiff in error might be able to make an equitable showing on the case, and, in addition to and together with an offer of full performance of its duty under the contract, present such equitable grounds for being relieved of payment of royalties on such quantity of sulphur as would entitle it to such relief. However, the burden would be upon plaintiff in error to establish such an equitable right.

The judgment of the Court of Civil Appeals reversing the judgment of the District Court is affirmed, and the cause is remanded to the District Court for new trial under the rules herein announced.
*Judgment of reversal and remand affirmed.*