**GENERAL FINANCE CORPORATION et al. v. DILLON.**

No. 3666.

United States Court of Appeals Tenth Circuit.

Feb. 2, 1949.

Rehearing Denied March 16, 1949.

W. E. Green and Robert J. Woolsey, both of Tulsa, Okl. (J. C. Farmer, of Tulsa, Okl., on the brief), for appellants.

Richard B. McDermott, of Tulsa, Okl. (Bradford J. Williams, Fenelon Boesche, and Thomas H. Trower, all of Tulsa, Okl., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action by Stephen V. Dillon against General Finance Corporation and its subsidiary Climax Industries Inc., a successor of Hanlon-Waters, Inc., to recover damages for an alleged breach of contract.

Prior to May 10, 1944, Dillon was engaged in business at Tulsa, Oklahoma, through the Dillon Company, a corporation, wholly owned by him, in the manu-

facturing and selling of grooved end pipe couplings, under patent inventions of his own. He had completed experimental work and tests for several other types of couplings referred to as the plain end and bayonet type, as well as others. His capital was limited and this in turn limited the amount of production he was able to turn out.

On May 10, 1944, Dillon entered into a contract with Hanlon-Waters of General Finance Corporation, in which it was agreed that Dillon and the Dillon Company would assign all rights in eleven patents and one pending application for a patent to Hanlon-Waters; that any improvement on the devices or new inventions relating to pipe couplings discovered or developed by Dillon during the term of the contract would be disclosed to Hanlon-Waters and Hanlon-Waters should have an option to accept or reject the same within a specified time; that in addition to assigning his patents, Dillon would also transfer all trade-marks, good will, customer lists, tools, molds, dies, drawings, and patents to Hanlon-Waters, and would sell at cost all couplings and parts on hand and would dissolve Dillon Company, the corporation, and would himself, refrain from manufacturing pipe couplings during the existence of the contract.

In return, Hanlon-Waters agreed to enter upon the development and sale of pipe couplings covered by the agreement as promptly as it was practical to do so under existing circumstances, and that it would undertake to manufacture such couplings and appliances on a quantity scale. In effect, it agreed to do all things necessary to promote the business of selling couplings to its fullest extent.

Paragraph 7 of the contract, in part, provided that:

" * * * Hanlon-Waters will have the right to determine for itself whether the competitive conditions and costs are *suitanle* for the manufacture of any particular device at a given time, will not be bound to manufacture all of the said devices at the same time, and will not be bound to do the marketing of any devices which in its judgment have become obsolete or do not meet market requirements."

The contract also provided for royalty payments to Dillon, for the return of Dillon's tools, molds, and special equipment on termination of the contract, and for the manner in which the contract might be terminated by either party thereto. Although it was not a part of the contract agreement, Dillon was subsequently employed by Hanlon-Waters as an engineer.

The parties operated under the contract until June 13, 1946, when Dillon terminated it in conformity with its provisions because of an alleged breach by Hanlon-Waters, and demanded the return of his equipment and the reassignment of all his patents and patent rights. In September, Hanlon-Waters offered to reassign the patents but did not offer to return the equipment and tools which it had received from Dillon. Dillon, thereafter, instituted this action for breach of contract, seeking to recover damages for failure to return his tools and special equipment, for loss of royalties by reason of failure to diligently exploit the market for the sale of his devices, for loss of profits during the period his patents were withheld after the termination of the contract, and for failure to develop and protect new devices accepted and withheld from him under contract.

The case was tried to the court. Detailed findings of fact and conclusions of law were made. In substance, the court found that Dillon had suffered damages for the following infractions of the contract by the defendants, and in the following amounts. Loss of royalties and interest for failing to promote the sale of defendant's devices, $87,091.87; value of molds and testing equipment at the time of the termination of the contract, $30,-627.50; interest on value of tools and equipment from July 13, 1946, to date of judgment, $2506.30; failure to initiate and/or prosecute patent applications, $2600.00; loss of profits after termination of the contract, $3,000.00; general damages, $5,000.00. Based on these findings, the court entered judgment against the defend-

ants for $130,825.67, and interest thereon from date of rendition, and for costs. This appeal challenges the correctness of this judgment, and the findings and conclusions of law upon which it is based.

Appellants challenge the correctness of the court's interpretation of the applicable part of paragraph 7 set out above. The court interpreted this provision of the contract to mean that thereby the parties intended to provide that General Finance and its successors should manufacture, produce, and market pipe coupling devices which Dillon then had in production or which were covered by letters patent, or improvements thereto subsequently discovered, on a quantity basis; that by the words "quantity scale" the parties intended a scale or rate of production sufficient to exploit with diligence the market then or thereafter available, and especially including the military market for grooved end pipe couplings to the fair extent of General Finance's ability to produce them, subject only to the limitation that General Finance could decline to manufacture any device when it determined that the manufacturing or marketing thereof would be unprofitable because of cost or competitive conditions; that General Finance could also decline to manufacture and sell all devices at the same time; and that General Finance could decline to manufacture any device that became obsolete or inadequate to fill the physical or mechanical demands of the market.

General Finance, on the other hand, contends that Paragraph 7 is to be interpreted as giving to it the sole and absolute right to determine whether it would manufacture any of the devices covered by the contract so long as it did not act arbitrarily in its decision and that it would become liable for failure to manufacture the devices only in the event that it acted arbitrarily or capriciously.

We agree with the interpretation of the trial court. From extensive evidence offered by the parties, the court found that Dillon had an established business in which he regularly sold these pipe couplings; that as of May, 1944, he had gross monthly sales of $4750.00 per month which netted him a profit of more than $1500.00 per month; that his financial resources were inadequate to permit him to satisfy the available market demands; that there was an extraordinary market demand for grooved end couplings of the type Dillon was then manufacturing; that especially there was in existence and in prospect an expanding military demand by the United States for such couplings, far in excess of either Dillon's or appellants' available facilities to meet. The court found that the contract of May 10, 1944, was executed by the parties with the military market for such couplings in specific contemplation and that both parties thereto intended, under the contract, to effect expanded production of the products covered thereby.

The evidence amply sustains these findings and conclusions. Not only do we conclude that the language of the contract lends itself to such a construction, but all the surrounding facts and circumstances negative an intent of the parties to transfer to appellants Dillon's entire business, cause him to disband his corporation, divest himself of the ability to carry on such business, and yet vest in appellants the sole and absolute discretion of determining whether thereafter it would proceed with the marketing of such devices, limited only by the requirement that its discretion must not be exercised arbitrarily or capriciously.

Surely Dillon did not intend to give up a business that was netting him $1500.00 per month, dissolve his corporation, transfer all his patents, tools, equipment, patterns, discs, molds and testing equipment, and turn over his customer lists and advertising matter to appellants, and further agree that any new inventions or improvements to existing inventions should be offered to appellants and made available to them without getting something in return other than an agreement that appellants would develop and promote the business if they chose to do so.

In construing a contract, it is not sufficient to look to the cold language alone. Words in a contract are used to

convey the meaning and intent of the parties. Such intent is gleaned not only from what is expressly stated therein but also from what is of necessity implied from the language used.[1] Thus considered, it is clear to us that the parties intended that appellants should develop the available market for Dillon's products to the full extent of their production capacity. They could only refuse to manufacture or sell such products as could not be marketed at a profit or had become obsolete and did not meet the demands of the market.

■ The trial court found that appellants arbitrarily failed to produce couplings for the military market and awarded damages for such breach totaling $87,091.-87. This finding is challenged by appellants as not supported by facts. It is argued that the failure to sell couplings to the military authorities was due to the fact that Dillon's couplings did not meet army specifications. In June and July of 1944, negotiations were being conducted with the army engineers looking to the purchase of Dillon's grooved end couplings. The army specifications required a change in the gasket used in Dillon's couplings from a multiple contact to a "C-ring" type gasket. The "C-ring" type gasket was disclosed in Dillon's patent and was then well established and in common use in industry. On July 5, 1944, Griffey, Vice President of Hanlon-Waters, wrote to Deacon, Vice President of General Finance Corporation, reporting the request of the army engineers for 100,000 grooved end couplings. In September, 1944, Hanlon-Waters was requested to produce 100,000 6-inch coupling housings only for the United States Engineers. The trial court also found that the change over to the "C-ring" type gasket could have been made at an approximate cost of $13,510.00 to effect tool changes to accommodate Dillon's couplings to army specifications and that the net profits of the initial order of 100,000 couplings would amount to $71,000.00. The trial court likewise found that future military orders for 6-inch grooved end couplings would have become available in amounts in excess of appellants' production capacity of 55,000 couplings per month after September 1, 1944. To recite the evidence in the record which sustains these facts would extend this opinion to unwarranted length. These findings are supported by the record and the court, therefore, correctly concluded that the refusal to produce these couplings for the military market constituted a breach of the contract.

■ The court's award of damages in the amount of $33,133.80 for loss of molds and equipment which appellants were required to return on the termination of the contract, and interest, is also challenged. This sum consists of two items— value of molds and testing equipment, $30,-627.50, and interest on the same from July 13, 1946, to date of judgment, $2506.30. Appellant concedes the correctness of this award with the exception of one item of $5,000.00 which was allowed for testing new molds to replace those which were not returned.

Appellants produced several witnesses who testified that if drawings from which an original mold was made were still available, an identical mold with the same dimensions could be produced and that such mold would produce the same sort of gasket as the original mold whether iron, rubber or other substance. These witnesses testified that in their opinion no testing of the product coming from such a substitute mold would be required. Dillon, on the other hand, however, testified that a mold received from a tool maker was not ready for production but frequently needed correction and that it was necessary to test gaskets coming therefrom to ascertain if and where corrections were required; that testing was at the buyer's expense; that to make sure the new mold was ready for production they had to make several kinds of tests. He testified also that prior to the beginning of the term of the contract he had made tests of his molds for

---

[1] See 13 C.J., page 558; 17 C.J.S., Contracts, § 328, page 778; 12 A.J. 765; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W. 2d 1039, 60 A.L.R. 890; Brooker Engineering Co. v. Grand River Dam Authority, 10 Cir., 144 F.2d 708; New York Casualty Co. v. Sinclair Refining Co., 10 Cir., 108 F.2d 65; Miller v. Miller, 10 Cir., 134 F.2d 583, certiorari denied 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 441.

various customers, including the U. S. Bureau of Ships at Annapolis, Maryland, which resulted in an approval of his products and that he could not sell his products under the old approvals but was required to conduct new tests to secure such approval. This brief outline of the testimony shows a clear conflict on this question which the court resolved against appellants.

Oklahoma, both by statute and by the decision of its courts, has said that where property has a peculiar value to its owner, such value is the measure of damages against one who had notice thereof prior to incurring "liability to damages in respect thereof, or against a wilful wrongdoer." [2] These molds had no general market value. Having them certified and approved gave them additional value and the necessity and expense of obtaining approval and certification of the replacement molds was a proper element of damage to be considered by the court.

■ Complaint is made of the item of $2600.00 which the court allowed for cost of preparing and filing four patent applications and for failure to complete the same. In Paragraph 3 of the contract, Dillon agreed to submit to the appellants any new inventions or improvements on outstanding patents and that appellants had the right to accept or reject the same within twenty days of their submission. Seven new devices were submitted to appellants under the provisions of Paragraph 3. Appellants accepted three of these orally, caused patent applications to be made and prosecuted for their protection. The four remaining new devices were tendered under the contract by letter dated October 12, 1945 and were accepted by appellants in writing October 29, 1945. No steps were thereafter taken by appellants to procure patent protection on these four devices. Notwithstanding that, on November 9, 1945, appellants determined and directed that no further steps be taken to procure or prosecute further patent proceedings on these devices; appellants nonetheless retained them until September 19, 1946, before releasing them to Dil-

lon. The court rightly concluded that where appellants accepted new devices which Dillon was required to tender they became obligated to protect the patents and proceed to perfect them. Furthermore, this is the construction which appellants placed on the contract. Dillon orally tendered three other new devices which were accepted in like manner. Patent applications were immediately filed on these three devices by appellants' attorneys. No like applications were filed on the four additional new devices and no steps were taken to protect them, notwithstanding that appellants retained them for nearly a year and thus prevented Dillon from protecting these devices. There was testimony that the reasonable costs incident to the preparation and filing of patent applications on these four devices were $2,000.00 and that the cost of completion of the applications was $600.00. The court correctly construed the contract as requiring appellants to bear the cost as to devices which they accepted when tendered under the contract and that Dillon was entitled to have the benefit of such services as to all devices which had been accepted.

■ Neither can we say as a matter of law from all the evidence in the case that an award of $3,000.00 damages for loss of profits from July 13, 1946, to September 19, 1946, when some of the molds were returned to him, is so excessive as to require a reversal. There was evidence that prior to the execution of the contract with appellants, Dillon's net profit from his business was at least $1500.00 per month. While appellants' argument that most of this was realized from war contracts which were no longer available during this two-month period may be persuasive, it is not conclusive nor compelling. Neither can it be said with finality that no such contracts would have been available to Dillon during this two-month period.

Finally complaint is made of the item of $5,000.00 awarded as general damages. Under the terms of the contract appellants agreed to develop the general market, as well as the military market. This $5,000.00

[2] See 23 O.S.1941 § 93; St. Louis & S. F. Ry. Co. v. Dunham, 36 Okl. 724, 129 P. 862; O. K. Transfer & Storage Co. v. Neill, 59 Okl. 291, 159 P. 272, L.R.A. 1917A, 58; Mitchell v. Wadsworth, 78 Okl. 125, 188 P. 1078.

item was for damages for failure to exploit the general market, failure to service existing customers' demands, alienation of customers, and damage to the good will which had been built up by Dillon in his business. From all the evidence it is clear that appellants made no real effort to promote the sale of Dillon's devices either to the military authorities or to the general public. When Dillon, who was employed by appellants as an engineer, brought in repeat orders from former customers, not only did appellants refuse to fill them, but also told Dillon to stay out of the sales department. On one occasion when Dillon brought to appellants' attention an inquiry from W. C. Norris and Company, of Tulsa, Oklahoma, about an order for 6,000 12-inch couplings, Snyder told him "they were not running a hip pocket business—that they were running a general business and that they could not be bothered with that kind of stuff."

This evidence, if believed, as it apparently was by the court, evidences an attitude on the part of appellants to shunt Dillon's devices into the background and devote their efforts to other fields of endeavor notwithstanding that in their contract they had assumed an obligation to exploit both the general and military market for devices such as Dillon transferred to them under the contract. Such conduct was bound to result in loss to Dillon consisting of loss of royalties from sales which he had a right to expect would be made and even more so from the destruction of good will which he had built up in the course of his business.

An examination of the entire record leads to the inevitable conclusion that appellants decided not to promote the sale of Dillon's products during the time the contract was in effect. They made no effort to develop either the military or general market. In fact they advised Dillon to forget the promotion of sales to the military, and, in effect, advised him that the promotion of sale of his products should be postponed. Appellants were engaged in other enterprises. It may be that the sale of these other products was more profitable to them. In fact there is evidence in the record which strongly supports this conclusion. However, under the contract they had undertaken to promote the sale of Dillon's products to the full extent of all available markets, limited only by their production capacity, as long as it could be done profitably, and failure to do this would subject them to all resulting damage.

▮ In general it is urged that in any event the damages, if any, resulting from these respective breaches of the contract were too speculative and contingent to be ascertainable. The general rule of damages is that damages for the breach of a contract cannot be recovered unless they are clearly ascertainable, both in their nature and origin, and unless it is established they are the natural and proximate consequences of the breach and are not contingent or speculative.[3] This is also the rule in Oklahoma.[4]

▮ It is also well settled that the amount of damages resulting from such a breach must be ascertainable with some degree of certainty and may not be based on mere speculation and conjecture alone. But when a breach of a contractual obligation with resulting damage has once been established, the mere uncertainty as to the exact amount of damages will not preclude the right to a recovery. In such cases it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference although the result may be only approximate.[5] The amount of damages resulting

[3] 15 A.J. 413-415; 25 C.J.S., Damages, § 28, pages 493-496.

[4] 23 O.S.1941 § 21; Chorn v. Williams, 186 Okl. 646, 99 P.2d 1036; Baker & Strawn v. Miller & Jones Bros., 109 Okl. 184, 235 P. 476; Ash v. Charles F. Noble Oil & Gas Co., 96 Okl. 211, 223 P. 175.

[5] Chorn v. Williams, 186 Okl. 646, 99 P.2d 1036; Ft. Smith & W. R. Co. v. Williams, 30 Okl. 726, 121 P. 275, 40 L.R.A.,N.S., 494; Ash v. Charles F. Noble Oil & Gas Co., 96 Okl., 211, 223 P. 175; Firestone Tire & Rubber Co. v. Sheets, 178 Okl. 191, 62 P.2d 91; Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Hoffer Oil Corporation v. Carpenter, 10 Cir., 34 F.2d 589; Shannon v. Shaffer Oil

from these breaches were not contingent and were susceptible of reasonable ascertainment and the amounts awarded were not excessive.

The court's interpretation of the contract, its findings of a breach by appellants with resulting damage to Dillon, and its findings as to each item of damage and the amount thereof all find support in the record. The judgment appealed from is, therefore, affirmed.

& Refining Co., 10 Cir., 51 F.2d 878, 879, 78 A.L.R. 851; Stanolind Oil & Gas Co. v. Kimmel, 10 Cir., 68 F.2d 520; Indian Territory Illuminating Oil Co. v. Townley, 10 Cir., 81 F.2d 159; Hedrick v. Perry, 10 Cir., 102 F.2d 802.