907 F.2d 1137
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
W. Arthur BENSON, Plaintiff-Appellee,
v.
GATOIL (U.S.A.), INC., Defendant-Appellant.
 No. 89-2361.
 United States Court of Appeals, Fourth Circuit.
 Argued April 6, 1990.
Decided June 6, 1990.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Frederic N. Smalkin, District Judge. (CA-86-2054-S)
 Joel Leising, Kaplan, Russin & Vecchi, Washington, D.C. (argued), for appellant; Bruno A. Ristau, Kaplan, Russin & Vecchi, Washington, D.C., on brief.
 Rob Ross Hendrickson, Boyd, Benson & Hendrickson, Baltimore, Md. (Argued), for appellee; Frank M. Benson, Jr., Boyd, Benson & Hendrickson, Baltimore, Md., on brief.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, and K.K. HALL and CHAPMAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 W. Arthur Benson (Benson), plaintiff-appellee, brought an action against Gatoil (U.S.A.) Inc. (Gatoil), defendant-appellant, alleging that Gatoil breached its obligations under a joint venture agreement by failing to hedge the venture's cost of oil and to supply a performance bond. The district court found in favor of Benson and awarded lost profits and post-judgment interest amounting to $279,723.77. Because we find the district court's holding not clearly erroneous, we affirm.
 
 
 2
 * On May 10, 1983, Benson and Gatoil agreed in a written contract to form a joint venture, known as Benson & Associates, for a period of one year and for the purpose of bidding, negotiating and performing governmental contracts in the petroleum area.[1] The joint venture agreement was signed at a meeting attended by Benson, Harry Jones, Gatoil's executive vice president, Pat Patterson, a commodity futures broker with Paine Webber, and Stanley Naples, Benson's friend and business associate. Under the agreement, Benson solicited bids for contracts while Gatoil provided the necessary financial backing in return for one half of the profits of the contract.
 
 
 3
 Before the signing of the joint venture agreement, Benson & Associates had already submitted and won a bid on May 4, 1983, with the Washington Metropolitan Transit Authority (WMATA) on a requirement contract to furnish diesel fuel for its fleet of buses for the period of July 1, 1983, through June 30, 1984. However, WMATA could not formally award the contract until WMATA determined that Benson & Associates was the "lowest responsible bidder," i.e., was financially responsible. Under Article 10 of WMATA's invitation for bids, this meant that the WMATA had to determine that "the bid price is reasonable ... and it is in the best interest of the jurisdiction to accept it." Benson & Associates was required to hold its bid for sixty days following its selection as low bidder. Harry Jones knew at the time of signing the joint venture agreement that Benson & Associates had won the contract with WMATA. However, Jones did not at any time fix the price of diesel fuel by either buying diesel oil futures contracts (called hedging) or buying diesel oil from an identified supplier for forward delivery over the life of the contract.
 
 
 4
 Following the signing of the joint venture agreement, the various parties met and corresponded frequently. In a meeting with WMATA on May 11, 1983, Benson told WMATA that Gatoil would be Benson & Associates' supplier on the contract and that Benson & Associates would be willing to post a $2 million performance bond, although the express language of WMATA's invitation for bids did not require the bond. In a letter dated May 12, 1983, WMATA requested "detailed information" from Benson, including Benson & Associates' source of supply, a written price commitment from the supplier, and the date of the performance bond's submission. Jones wrote WMATA on May 12, 1983, confirming that Gatoil would be supplier and providing bank references. Without objecting to the bond requirement, Jones looked into obtaining a bond through Marsh & McLennan, an insurance and bonding firm; this endeavor proved unsuccessful because he was unable to obtain collateral in the form of $2 million in cash or a letter of credit.
 
 
 5
 WMATA wrote Benson on June 15, 1983, enclosing for Benson's signature the proposed contract, which required the posting of a performance bond by June 30, 1983. Although Jones had been unable to procure a performance bond, Benson executed the contract with WMATA around June 24, 1983, although the contract was backdated to June 9, 1983. According to Gatoil, Benson did not obtain Gatoil's express agreement to the terms, including the bond requirement, as the joint venture agreement mandated. In a letter dated July 1, 1983, WMATA gave Benson until July 15, 1983, to submit the bond, and sought to change the date to commence delivery from July 1 to July 11, 1983. Benson replied that it was unable to accept WMATA's "unilateral attempt to change the contract as agreed to and executed by both parties on June 24, 1983." As a result, WMATA subsequently found another supplier at a higher price.
 
 
 6
 In late 1984, WMATA sued Gatoil and Benson for failure to provide diesel fuel under the contract and ultimately negotiated a settlement of its claim against Gatoil but not Benson. Afterwards, Benson sued Gatoil for $480,000 in lost profits. The district court found as a fact that Jones had failed at any time to insure the profitability of the contract by hedging. The district court also found that Gatoil was obligated to assure WMATA of the financial responsibility of Benson & Associates and breached this duty by failing to arrange for the bond and instead only sending its May 12, 1983, letter. The court based both of these duties on either an implied term in the agreement or a collateral agreement with Benson arising on May 10, 1983. As a result, the court awarded half of the venture's lost profits, or $279,723.77, to Benson. Gatoil appeals the district court's holding that Gatoil was obliged to hedge the contract.
 
 II
 
 7
 The joint venture agreement does not expressly impose an obligation upon Gatoil to hedge the contract between Benson & Associates and WMATA. The district court, however, found that Gatoil had a duty to hedge under an implied term of the contract, emphasizing repeatedly that Jones knew or should have known that hedging was the only way Benson & Associates' contract with WMATA could realize a profit. Although Gatoil argues that the language of the contract does not imply such a term, we are not convinced that the court clearly erred in making this finding.
 
 
 8
 Texas law holds that "[a] contract includes not only what is expressly stated but also what is necessarily to be implied from the language used; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face." Lilac Variety, Inc. v. Dallas Texas Co., 383 S.W.2d 193, 196 (Tex.Civ.App.1964) (citing Freeport Sulphur Co. v. American Sulphur Royalty Co., 6 S.W.2d 1039, 1042 (Tex.1928)). Yet an implied term may be found only from the language of the contract itself:
 
 
 9
 The real intention of the parties should be ascertained by the language used in the agreement. The question is not what the parties meant to say but the meaning of what they did say by the use of the words contained in the agreement.
 
 
 10
 Dedier v. Grossman, 454 S.W.2d 231, 234 (Tex.Civ.App.1970). In addition, after looking only at the contract language, a court may "add to, modify, or change" a contract only where there is "fraud or mistake." Id. at 235. And the mistake must be such that
 
 
 11
 it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument.
 
 
 12
 Danciger Oil & Refining Co. of Texas v. Powell, 154 S.W.2d 632, 635 (Tex.1941).
 
 
 13
 With these principles in mind, we conclude that the district court's finding that hedging was an implied term of the contract insofar as it was necessary to guarantee the contract's profitability is not clearly erroneous. As the district court pointed out, the only way to make a firm fixed-price contract profitable is to assure that the price of the supply over the contract period is below the sale price fixed in the contract. The only way (in absence of contracting for forward delivery from an identified supplier, which Jones did not consider a viable option) to assure the price of the supply is to hedge. Hedging in this situation is so patently indispensable to effectuate the full purpose of the contract that it was superfluous to provide for it in the contract. It is manifest that Gatoil was the party to do the hedging, given the division of responsibilities under the joint venture agreement: Gatoil was obliged to supply all necessary financing for the purchase of oil, and Benson was required to submit bids, negotiate contracts, and provide necessary support personnel. Finally, the court found, and Gatoil does not deny, that Gatoil thought it would hedge the contract, as shown by Jones' conduct on May 10 indicating that a hedging account would be opened and by Jones' calculations of profit under the contract, which would need some assumptions about hedging. Therefore, the district court could properly find an implied hedging requirement from the language of the contract.[2]
 
 
 14
 Gatoil argues that it was not required to hedge the contract on May 12, 1983, because Benson & Associates was not formally awarded the contract until Benson signed the contract with WMATA on June 24, 1983. Yet the district court did not base Gatoil's duty to hedge on any final awarding of the contract; instead, the court found that "the contract would have been regarded in the trade generally as sufficiently awarded as of May 11th to bring into play the duties of the joint venture of Gatoil to finance." Indeed, the only way that hedging could be effective is if it was done at most a day or two after Benson & Associates was chosen low bidder by WMATA. Gatoil makes no argument that the practices of the trade were otherwise. Thus, there is no error in the court's finding that Gatoil had a duty to hedge on May 12, 1983, and in measuring damages from that date.
 
 III
 
 15
 For the above reasons, the district court is
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 Inexplicably, the agreement was backdated to January 10, 1983
 
 
 [2]
 Because we find that the district court did not err in finding that Gatoil had an implied duty to hedge the contract between Benson & Associates and WMATA, we express no opinion on the court's alternative holding that Benson and Gatoil reached a collateral agreement requiring Gatoil to hedge the contract