ADKINS et al. v. ADAMS et al.
No. 346–D.

District Court, E. D. Illinois.
March 28, 1944.

C. E. Feirich, of Carbondale, Ill., and J. G. VanKeuren and Henry H. Harbour, both of DuQuoin, Ill., for plaintiff E. S. Adkins.

Essington, Beebe & Pratt, of Chicago, Ill., and Williams & Harrison, of Benton, Ill., for plaintiff Old Ben Coal Corporation and City Bank Farmers Trust Co.

J. Max Mitchell, of West Frankfort, Ill., and William G. Eovaldi, of Benton, Ill., for cross-defendants Joe Boner, Sophia Boner, Harrison Boner, Jessie Boner, Ralph Boner, Vera Boner, Isabella Russell and Charles Russell.

Frank E. Trobaugh, of West Frankfort, Ill., and Moses Pulverman, of Benton, Ill.,

for defendants and cross-complainants Dan Adams, Ross Bartmes, Carri B. Bartmes and Charlie Pollack.

WHAM, District Judge.

Plaintiffs, claiming to be the exclusive owners of the oil and gas rights under the land in question as assignees of a mineral or mining lease (hereafter referred to as "mining lease") given in 1909 by S. M. Boner, then owner of the land, to Wilmington Star Mining Co., a corporation, seek to obtain cancellation, as a cloud upon plaintiffs' title, of an oil and gas lease given by defendant Dan Adams, present owner of the land subject to said mining lease, to defendant Ross Bartmes on June 26, 1943; also aid of injunctive process. Defendants claim that said mining lease, under which plaintiffs claim, in so far as it purports to grant or convey oil and gas rights, is, and at all times has been, invalid for want of mutuality, consideration and definitiveness, but, if valid to carry rights to the oil and gas at the time it was entered into, such rights were abandoned or otherwise forfeited by the lessee and had reverted to the owner of the land long before Dan Adams gave said oil and gas to Bartmes.

Defendants not only deny plaintiffs' claim of oil and gas rights under said mining lease but, claiming as successors in title to the land to said S. M. Boner, lessor, assert ownership of the oil and gas underlying the land and by their cross-complaint seek to have their rights thereto decreed by this court and to have cancelled the aforementioned mining lease and all assignments thereunder in so far as they purport to convey or give rights to the oil and gas or right to explore for and recover same. They also seek to have cancelled as invalid and a cloud upon their title certain instruments under which the cross-defendants (hereinafter referred to as the "Boners") and others under them, claim to own the oil and gas under said land and to have their claims denied.

The cross-defendants, the Boners, not only concede but seek to uphold the validity of the 1909 mining lease and the claims of plaintiffs under the lease to exclusive oil and gas rights but claim that they, as descendants and devisees of said S. M. Boner, lessor, own all minerals and mineral rights in said land subject to said mining lease and all rights and benefits under said lease. They deny that defendant Adams and the claimants under him have any

rightful claim or interest in any of the minerals or mineral substances under the land, including the oil and gas, or rights to benefits under said 1909 mining lease, as successors in title to the land to said S. M. Boner.

It is stipulated by all parties that the common source of title to all interests in and to the lands involved is said lessor, S. M. Boner, who was the owner in fee on January 1, 1909.

Defendant Adams and those claiming under him trace title back to said S. M. Boner through his warranty deed dated July 12, 1918 to H. M. Ragsdale which in so far as here pertinent reads as follows: "The grantors S. M. Boner and Nelia Boner his wife * * * for and in consideration of Twenty-Five Hundred Dollars in hand paid, convey and warrant to H. M. Ragsdale * * * the following described Real Estate, to-wit (describing it) Subject to a certain coal lease given by the grantor to the Wilmington Star Mining Co., together with the conditions named therein in said lease; situated * * *."

Adams claims that the effect of said deed was an unqualified conveyance of the land to Ragsdale, subject to the lease, without reservation by Boner of any interest in the land or rights under the lease. The Boners claim that the effect of the entire "subject to" clause, including the words "together with the conditions named therein in said lease," which they emphasize, was to exclude from the conveyance by the deed to Ragsdale all coal, minerals and mineral substances underlying the land and the right to mine same, and to retain same in Boner with all rights to any rents or royalties under the lease. They claim that the deed is in practical effect but a surface deed and that Ragsdale took nothing more.

In support of their position the Boners point out that the evidence shows that said S. M. Boner at all times acted in connection with the land after the date of the Ragsdale deed as if he were the owner of the minerals under the land subject to the lease and that at no time did Ragsdale or anyone claiming under him claim of the Old Ben Coal Corporation, the assignee of the lease, any right to any of the minerals under the land or any rights under the lease until after the oil activities started in Southern Illinois in 1937. They also point out that Adams took his title from one Persharkey, successor in title to Ragsdale, by a form deed entitled "Deed to Surface Reserving

Coal, etc." which reserved the coal, oil and gas, on May 9, 1928, and did not obtain the quitclaim deed from said Persharkey under which he claims his right to the oil and gas until April 26, 1938, after the interest in oil became active. Said quitclaim deed from Persharkey contains the recital, "This deed is made for the purpose of correcting an error in and to fully express and carry out the intentions of the parties to the deed dated May 9, 1928 * * * and to fully complete the contract of sale between parties."

Regardless of the conduct of the parties subsequent to the delivery of the deed from Boner to Ragsdale in 1918, the language of the deed appearing to be entirely unambiguous, the controversy between defendants and the Boners turns solely upon the legal effect of the deed from S. M. Boner to H. M. Ragsdale. Weill v. Centralia Service and Oil Co., 320 Ill.App. 397, 51 N.E.2d 345; Young v. Illinois Athletic Club, 310 Ill. 75, 141 N.E. 369, 30 A.L.R. 985. The deed is an outright and unqualified conveyance of the land without reservation but subject to the lease. Under the law of Illinois such a deed conveys to the grantee the fee simple title to the land subject only to the burdens of the lease. It carries to the grantee all rights and benefits under the lease in the form of rents and royalties, as well as all reversionary interests. Crosby v. Loop, 13. Ill. 625; Dixon v. Niccolls, 39 Ill. 372, 89 Am.Dec. 312; Disselhorst v. Cadogan, 21 Ill.App. 179; Central Republic Trust Co. v. Peterson Furniture Co., 279 Ill.App. 492; Updike v. Smith, 378 Ill. 600, 39 N.E.2d 325. The general rule is in accord. 36 C.J., Sec. 1212, pages 367-368; 3 Summers on Oil and Gas, Perm.Ed., Chap. 20, § 600, pages 483, 484; Clark v. Strohbeen, 190 Iowa 989, 181 N.W. 430, 13 A.L.R. 1419; Bibb v. Nolan, Tex.Civ.App., 66 S.W.2d 156, 157.

There is nothing in the words "together with the conditions named therein in said lease," relied upon by cross-defendants which indicates any intention that the "subject to" clause should require a construction or interpretation other than its plain meaning or that its effect should be different from that usually given a like "subject to" clause under the laws of Illinois. It would seem that said words add nothing to the "subject to" clause except to make it plain that the land conveyed was burdened with and conveyed and warranted subject to all the conditions contained in the mining lease which is referred to merely as a "coal lease." The warranty deed to Ragsdale left no lawful or enforceable right or interest in the land in the grantor S. M. Boner under the lease, or otherwise. Consequently, none descended to his heirs nor could by him be lawfully devised or otherwise conveyed or transferred. Persharkey through mesne conveyances became the owner of all interests which were conveyed to Ragsdale, namely, the fee simple title to said land subject to but with all rights arising under said mining lease and Adams through the deeds mentioned above became the owner of all Persharkey's right and title to the land.

The controversy between the plaintiffs and defendants growing out of the complaint and cross-complaint hinges upon whether said mining lease was a valid oil and gas lease when made and, if so, whether it has since ceased to be valid and binding by reason of abandonment or forfeiture or passage of time. These questions, in turn, involve the intention of the parties as expressed in the lease and whether the lease, covering as it does other minerals besides the coal, is a divisible or an indivisible contract. If it can be separated into independent parts, one part being a coal mining lease and another an oil and gas lease, and other parts being leases of other minerals and mineral substances, then the legal principles which govern ordinary oil and gas leases will be applicable to the portion which applies to oil and gas. If it is a single, indivisible contract not susceptible of being separated into independent parts, then the intentions of the parties in making the lease of the oil and gas an indivisible portion of the entire lease must be sought and given effect.

In Manhattan Life Ins. Co. v. Prussian Life Ins. Co., 2 Cir., 296 F. 39, the court in determining that the contract before the court was not divisible made use of the test suggested by Williston on Contracts, Section 863: "Did the parties assent to all the promises as a single whole, so there would have been no bargain whatever, if any promise or set of promises were struck out?"

In Foley & Co. v. Excelsior Stove & Mfg. Co., 265 Ill.App. 78 at pages 94, 95, the court stated that the usual definition of an indivisible contract is contained in the quotation, "A contract is entire, when, by its terms, nature and purpose, it contem-

plates and intends that each and all of its parts and the consideration shall be common each to the other and interdependent." 13 Corpus Juris 561; 17 C.J.S., Contracts, § 331; Bank of Antigo v. Union Trust Co., 149 Ill. 343, 36 N.E. 1029, 23 L.R.A. 611.

In Keeler v. Clifford, 165 Ill. 544, 547, 46 N.E. 248, 249, the court said: "The question whether a contract is entire or severable cannot be determined by any precise rule, but must depend upon the intention of the parties, which in each case is ascertained from the language employed and the subject-matter of the contract." 17 C.J.S., Contracts, § 332.

In Cosden Oil Co. v. Scarborough, 5 Cir., 55 F.2d 634, 637, in a case involving an instrument which was solely an oil and gas lease the court said: "Whether a contract is entire or severable depends primarily upon the purpose and intent of the parties, to be derived from the language used, and the subject-matter and purpose of the contract, in the light of ordinary rules of construction. Texas Co. v. Waggoner, Tex. Civ.App., 239 S.W. 354, 355. Whether, then, a particular contract under review is divisible in whole or in part as to any or all of its terms, must be determined as to each contract, by the terms of that contract."

Since the meaning of every contract and the intent and purpose of the parties must be determined from its own provisions, "in the light of ordinary rules of construction" and since the litigants here have been unable to find any decided case involving a contract like the one here in controversy, it is set out in full in the margin.[1]

An examination of the text of the contract discloses a mining lease covering all coal, minerals and mineral substances un-

---

[1] "This Indenture, Made and Entered into this First day of January, A.D. 1909, by and between S. M. Boner and E. A. Boner, his wife, of the County of Franklin and State of Illinois, parties of the first part, and Wilmington Star Mining Company, a corporation organized and existing under and by virtue of the laws of the State of Wisconsin, party of the second part,

"Witnesseth, That the said parties of the first part, in consideration of the sum of One ($1.00) Dollar, the receipt whereof is hereby acknowledged, and the covenants and agreements hereinafter contained to be kept and performed by said party of the second part, have demised, leased, and to mine let, and by these Presents do demise, lease and to mine let to said party of the second part, all the coal and other minerals or mineral substances contained in or underlying the following described Real Estate, towit:

"West Half of the North West Quarter, and the West Half of the North East Fourth of the North West Quarter, and the South East Fourth of the North West Quarter, all in Section Thirty (30), in Township Seven (7), South, Range Three (3) East of the Third P.M., containing One Hundred Forty (140) Acres, excepting Railroad Right of Way off West Side of said West Half of the North West Quarter above described; and the South Half of the North East Quarter of the South East Quarter, and the South East Quarter of the South East Quarter of Section Nineteen (19); all in Township Seven (7), South, Range Three (3) East of the Third P.M., situated in the County of Franklin, in the State of Illinois, together with the right to enter upon and into said premises and to dig, mine and remove said coal and other minerals or mineral substances, or any part thereof, at such time and in such manner as said party of the second part may elect, without liability for any damage to the surface or improvements thereon, arising from so doing, either at the time of the taking out of said coal and other minerals or mineral substances or at any time thereafter. And the said parties of the first part hereby grant and lease unto said party of the second part so much of said land, and the surface thereof, as may be necessary, convenient or expedient for it to use for the proper and economical mining of said coal and other minerals or mineral substances, including the right to locate, sink and construct shafts therein and other necessary structures connected therewith, and the right of way for a railroad or railroads, mine roads, wagon roads, turn outs, switches, ditches, drains and ponds, and the right to take without charge from said land all earth and other materials required in the construction of such railroad or railroads; together with the use of so much of the surface of said land as may be necessary or expedient for preparing and forwarding the coal to be mined under this agreement and for piling coal and culm. Provided that none of the rights conveyed by this paragraph shall be exercised in such manner as to interfere with dwelling houses or other buildings or any garden enclosure on said lands. Said party of the second part agrees to fence all railroad switches with a hog tight fence and to keep the same in good repair with necessary gates and crossings. "And said parties of the first part fur-

derlying and contained in the land described therein. It is conceded by defendants that oil and gas are within the meaning of the terms minerals and mineral substances as used in this contract.

A study of the text shows that the lessor "in consideration of One ($1.00) Dollar * * * and the covenants and agreements hereinafter contained to be kept and performed" by the lessee "demised, leased and

ther agree that all the rights and privileges hereby granted, together with all tunnels and underground passages which may now or hereafter exist in said land, and all openings, buildings, railroads, or other appurtenances constructed under this agreement, may be used by said party of the second part for the purpose of mining, preparing and forwarding coal from any adjoining and contiguous lands until such time as all the coal in said adjoining or contiguous lands which the said party of the second part may desire to mine shall have been exhausted, and may repair, rebuild, reconstruct or remove any and all buildings, fixtures, appurtenances and improvements at any time until such coal shall have been exhausted, as aforesaid; provided that all such buildings, fixtures, appurtenances and improvements may and shall be removed from said land within a reasonable time after the termination of this agreement.

"Said parties of the first part shall pay all taxes on the lands hereby leased, except lessee shall pay all taxes on all improvements placed by it on such land,

"The said party of the second part, for itself, its successors and assigns, hereby covenants and agrees to pay to said party of the first part the sum of two and one-half (2½) cents for each and every ton of two thousand (2,000) pounds of run of mine coal mined and removed from the lands hereby demised; said coal for the purpose of ascertaining the amount of royalty, shall be weighed before being removed from the place of loading, and the amount of such royalty shall be due and payable on the first day of the second month after the month in which said coal shall have been mined and weighed as aforesaid, that is to say, the royalty of two and one-half (2½) cents per ton on the coal mined and weighed during the month of January shall be paid on the first day of the following March, the royalty on coal mined and weighed in February shall be paid on the first day of the following April, etc.

"The amount of coal mined as aforesaid and the amount of royalty due therefor for each and every month of the term of this lease shall be shown by the books of the party of the second part, and if required the said party of the second part shall furnish to said party of the first part a statement thereof, verified by affidavit.

"Said party of the second part further

agrees to pay to said party of the first part, commencing with the year 1909 and continuing until such time as actual mining operations are begun on the land hereby leased, a yearly rental of one (1) dollar for each and every acre contained in the premises hereinbefore described, said rental to be payable yearly in advance on the first day of each year; provided, however, that the amount of such yearly rentals paid as aforesaid shall be credited to said party of the second part and allowed as an advance payment of the royalty of two and one-half (2½) cents per ton, hereinbefore provided for, and shall be deducted without interest in installments not exceeding in amount one-half of the amount of royalty due at the time said installment is deducted.

"And it is further agreed that if at any time the said party of the second part, its successors or assigns, shall be in default or fail to pay any sum due for rent or royalty as herein provided and such default or failure to pay shall continue for ten days after written demand thereof by the parties legally entitled to receive such payment, the said party of the second part its successors and assigns shall forfeit all right to mine or otherwise hold and enjoy the said premises hereby demised, and the parties of the first part, their heirs, executors, administrators or assigns, may at once, or at any time thereafter, enter into the exclusive possession thereof, and hold the same free from and discharged of, any and all claims of the said party of the second part, its successors and assigns.

"It being further provided as a part of the consideration herein that the party of the second part shall within two years of this date commence the sinking of proper main and air shafts some where on the body of land of which the land herein forms a part and shall continuously continue same to completion and operation in a reasonable manner all things considered, and that in case party of the second part is not mining any coal from under the One hundred and forty (140) acres of parties of first part that adjoins the C. & E. I. R. R. within one year after lessee reaches the coal in the said main shaft that then after the expiration of such one year after the coal is reached in said main shaft and until lessee is mining coal from said 140 acres of land lessee shall pay in advance an annual rental of two dollars per acre in lieu of the one dollar heretofore provided, it being

to mine let * * * all the coal and other minerals or mineral substances" underlying the land described in the lease to the lessee. The consideration so expressed does not lend itself to separation among the various minerals and mineral substances covered by the lease. The one dollar and each of the covenants and agreements referred to is consideration for the entire lease. No single mineral can be dissected out from the others and the lease as to it said to be without consideration. The rental for the land for which specific provision is made in one of the covenants is consideration for the entire lease. The same is true of the covenant to pay specific royalties for all coal mined. The same is true of the covenant to pay for any other mineral mined the usual and customary price when mined. The same is true of the provision, specifically made a part of the entire consideration, that lessee would, within two years, commence and continue to completion on the land proper main and air shafts for coal mining, and pay an increased rental unless coal was actually being mined within one year after the coal was reached.

For all the foregoing consideration moving from the lessee to the lessor the lessee was given the mining lease with the right "to enter upon and into said premises and to dig, mine and remove said coal and other minerals or mineral substances, or any part thereof, at such time and in such manner as the lessee may elect" without liability for damage in so doing. The lessee was also given the right to erect and keep in repair certain structures on the land and make certain uses of the surface in connection with mining, preparing and moving the coal from under the land and from under adjoining and contiguous land until the exhaustion of the coal the lessee desired to mine but with the obligation to remove such surface structures after termination of the agreement.

The entire lease was made subject to forfeiture for failure to pay rent or royalty due for more than ten days after written demand. If the yearly rental in advance had not been paid the first year and such default had continued beyond ten days after written demand for the payment due, the entire lease, including not only the provisions relating to coal. but to all other minerals or mineral substances, would have been forfeited. The entire lease was likewise made subject to forfeiture by failure on the part of lessee to commence sinking and continuing to completion proper main and air shafts for mining coal as required by the lease as to which undertaking time was made material.

■ As relates to the mining of the coal and as relates to the obligation of the lessee to explore for and begin mining other minerals, including oil and gas, it would appear from what has been said that the lease is an entirety not susceptible to separation into parts and the application to the separate parts of the implied covenants urged by defendants without doing violence to the intention of the parties and thwarting the very purpose of the parties in making the lease cover all the minerals instead of the coal only which was the only mineral then known to exist in paying quantities.

The wisdom or lack of wisdom of the lessor in tying up all of his mineral rights with the lease of his coal rights, and subjecting the time of exploration for them and their development to the election of the lessee can better be measured and understood in the light of the existent known facts at the date of the lease.

The evidence shows that when the contract was entered into in 1909 it was known that valuable deposits of coal underlay the land and great interest in coal mining existed throughout the area where the land is located. It was known that the development of a coal mining property required a heavy outlay of money for shafts, machinery, equipment and transportation facilities and that a coal mine in active operation, leased on a fair royalty basis, would pay large aggregate royalties to the landowner. It was not known that oil, gas, or other minerals or mineral substances other than coal underlay the land in paying

---

understood that the time mentioned relating to the sinking of shafts is material and that upon default of lessee·to comply therewith this lease shall be void.

"And the said parties of the first part as to the interest by this lease conveyed, and no further, hereby releases and waives all rights under and by virtue of the homestead exemption laws of the State of Illinois.

"It is further agreed that in case any mineral other than coal is mined then the usual and customary and reasonable price paid therefor at time of mining shall be paid for such other mineral when mined.

"In witness whereof, * * *."

quantities or would ever become commercially desirable. It was known that oil and gas in paying quantities had been found in Lawrence and Crawford and Marion counties, none of which were nearer than fifty miles, the nearest being a very small field at Sandoval, Illinois. There were no facts existent upon which the landowner could base a substantial expectation that his land would be tested for oil in the reasonably near future, or, if tested, that oil would be found. There were no facts existent which would have justified the lessee in binding itself to use its stockholders' money in exploring this land for oil within a reasonable period. Both parties were immediately interested solely in the mining of the coal and in protecting the interests of both parties in that important field of development. Both knew, however, that at some indefinite future time, somebody might want to test the land for oil and gas and that if oil were thus found, it might become desirable to drill many wells on the property; that whether one or more test wells or one or more oil or gas wells were drilled on the land, there would be risk of damage to the coal mining property and operations, as well as a possible increase in the risk to the lives of the miners. For those reasons it was important both to the lessor and to the lessee that the lessee or assignee who developed and carried on the coal mining should have control of all the mineral and mining rights in the land, including the oil and gas. The evidence is that lessee would not have entered into the lease without such control. To the lessor the desirability of securing and safeguarding the coal development was very important. The prospect that other minerals possibly underlying the land would ever become valuable was unpromising. Consequently, he was willing to give and did give over the control of all mining on the land for the duration of the lease in order to secure a favorable contract for the development of the coal.

That lessor, by the lease, gave up the right to require lessee to explore the lease for oil within a reasonable time was neither unwise nor unreasonable in view of the main purpose of the lease. It did not mean that there would be no exploration. The lessee's larger interest in the oil under prevailing practices at all times following the date of the lease between lessor and lessee would constitute a continuing encouragement to the lessee to explore for oil at any time such exploration seemed promising. As said in Ohio Oil Co. v. Reichert, 343 Ill. 560 at page 568, 175 N.E. 790, at page 793, "From a financial standpoint appellant (lessee) had several times more interest in producing an oil well than the land owners." The evidence shows that since it has been known that oil existed in the territory where this land lies the Old Ben Coal Corporation has been untiring in its effort to secure a test on this land.

■ But even though the lease as written operated harshly as against one party or the other it was voluntarily entered into and, there being no evidence or charge of fraud, neither is in position to complain as long as its terms are fulfilled. Poe v. Ulrey, 233 Ill. 56 at pages 63, 64, 84 N.E. 46, at page 49.

The inclusion of the oil and gas in the lease was not for the sole purpose of speculation on lessee's part. It was important to the entire venture that the lessee be in position to control all mining on the lease, including possible drilling for oil. This purpose would have been thwarted had the lease been so drawn as to require lessee to prospect for oil within a reasonable time or forfeit the lease. That would have required a large outlay of money in the sheerest sort of wildcat prospecting wholly unjustified from a business standpoint or giving up the right to protect the coal mining operation at a time when the greatest investment therein would be jeopardized.

■ It is said by defendants that because no definite time within which lessee must explore for oil or gas was specified the law implied a covenant to make such exploration within a reasonable time. That would be true were this an independent oil and gas lease wherein the procurement of a test of the land for oil and gas and royalties from the oil and gas, if found, constituted the main purpose and consideration of the lease. Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N.E. 308; Crain v. Pure Oil Co., 8 Cir., 25 F.2d 824, 830; Summers Oil and Gas, Vol. 2, Perm.Ed., §§ 395-397.

But here the main purpose and consideration was the procurement of the development of the coal, and the lease of the other "minerals or mineral substances contained in or underlying" the land was secondary and incidental, though important, to the procurement and safeguarding of the development of the coal. Pursuant to its

952

main purpose the lease gave the lessee the right to enter and mine and remove coal and other minerals, or mineral substances, in such time as it might elect and made no provision for exploration at all. From the entire lease (Shell Oil Co. v. Moore, 382 Ill. 556, 48 N.E.2d 400; Chicago, W. & F. Coal Co. v. Minier, 7 Cir., 127 F.2d 1006) it is apparent that there was no intention that the lessee should be required or expected to explore for oil or gas within a reasonable time or at any specific time within the term of the lease, except at the election of the lessee, and, therefore, the law would imply no covenant on the part of the lessee to prospect or explore within a reasonable time. Skinner v. Ajax Portland Cement Co., 109 Kan. 72, 197 P. 875; Brimmer v. Union Oil Co. of California, 10 Cir., 81 F.2d 437, 105 A.L.R. 454; 1 Thornton Oil and Gas, Section 169, p. 295; Freeport Sulphur Co. v. American Sulphur Royalty Co. of Texas, 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890.

Here there was an express contract based upon an express consideration giving the lessee the right to take and remove the minerals at such time as it might elect and no implied covenant could arise in conflict therewith or controlling the same subject matter. Walker v. Brown, 28 Ill. 378, 81 Am.Dec. 287; Ford v. McVay, 55 Ill. 119.

The principal apparent purpose of the parties is given great weight in determining the meaning to be given to manifestations of intention or to any part thereof. Restatement of the Law of Contracts, Section 236(b), p. 327.

This case is not like the case of Mills v. Hartz, 77 Kan. 218, 94 P. 142, upon which defendants rely. There a lease "for gas, oil or coal purposes" giving the "exclusive right to dig, bore and mine for gas, petroleum oil and coal" was entered into for a term of twenty years and as much longer as gas, coal and oil were found in paying quantities. The consideration expressed was one dollar and a royalty of eight cents a ton on coal mined, and if gas found in paying quantities, fifty dollars per annum for each well. After seven and one-half years had elapsed during which lessee did nothing under the lease a suit brought to cancel on ground of abandonment was sustained. But in the case before this court the contract was to pay a specified annual rental in advance for the land until the coal was developed, to sink shafts and to pay royalties on every ton of coal removed. This was done. Many thousands of dollars were promptly invested in the sinking of shafts, equipping a mine and mining and removing coal. A large portion of the coal underlying the land has been mined and royalties amounting to many thousands of dollars have been paid pursuant to the terms of the lease and the terms of the lease in all respects have been fulfilled. The main purpose of this lease has been achieved or is in course of achievement. The consideration for the entire lease has been paid to date to the extent required by the lease.

It is contended that in so far as the lease covers oil, gas and minerals other than coal it is invalid, or a mere option, because it did not bind the lessee to do anything and is without term. Cortelyou v. Barnsdall, 236 Ill. 138, 86 N.E. 200; Federal Oil Co. v. Western Oil Co., 7 Cir., 121 F. 674; Miller v. Moffat, 153 Ill.App. 1; Illinois Kaolin Co. v. Goodman, 252 Ill. 99, 96 N.E. 867. But the lease did require the sinking of shafts and the payment of an annual acreage rental or a development of the coal with payment of an agreed royalty. This, as heretofore pointed out, was consideration for the entire lease, including other minerals than coal and the right to elect when to mine and remove all minerals, including coal.

Then, too, as I view the lease, it is not without term as it affects oil, gas and minerals other than coal, or as it affects coal. Though the term may be indefinite as to time of duration, it is apparent from the provisions of the lease that its termination was contemplated as of the time when all the coal had been exhausted under this land and under contiguous land from which lessee desired to mine and forward the coal through the tunnels and shafts on this land. Within a reasonable period after such exhaustion of the coal it will become the duty of the lessee to remove the buildings and other improvements. I have no doubt that, despite the election clause, if no steps have been taken in the meantime by the lessee to explore or mine for oil or gas or minerals or mineral substances other than coal the right to do so will be lost within a reasonable time after the coal has been exhausted. It seems reasonable to expect that such exhaustion will occur in a much shorter period than ninety-nine years from the date of the lease, which was the term of the lease in

Skinner v. Ajax Portland Cement Co., supra.

That there is no express covenant and none. implied under the facts and circumstances which binds the lessee to explore for oil and gas within a reasonable time does not necessarily preclude and probably does not preclude an implied covenant on the part of the lessee to protect the land against unreasonable waste by drainage through any offset oil and gas wells by drilling such well or wells thereon as might reasonably be. required for that purpose. This question is not before me for decision.

In view of what I have said the equities would appear to be with the plaintiffs as against the defendants and with the defendants as against the cross-defendants. Costs will be adjudged two-thirds against the defendants and one-third against the cross-defendants. Counsel for plaintiffs may prepare findings, conclusions and decree pursuant hereto and present same to the court, upon notice to counsel for all other parties.