Intern'l Chem-crete v. Unique Four-S 















IN THE
TENTH COURT OF APPEALS
 

No. 10-91-153-CV

     INTERNATIONAL CHEM-CRETE
     CORPORATION, ET AL.,
                                                                                              Appellants
     v.

     UNIQUE FOUR-S, INC., ET AL.,
                                                                                              Appellees
 

From the County Court at Law
Johnson County, Texas
Trial Court # C91-00081
                                                                                                    

O P I N I O N
                                                                                                    

      International Chem-Crete Corporation and Radi Al-Rashed, defendants, appeal a judgment
entered by the County Court at Law of Johnson County in a forcible-detainer action. The
judgment awarded them possession of the realty conditioned upon their paying $6450 into the
court's registry for the benefit of the plaintiffs, Unique Four-S, Inc. and James and Tina Skinner. 
Otherwise, Unique and the Skinners were to have possession.
      The first point is based on the failure of the court to file findings and conclusions that were
timely requested. We abated the appeal and ordered the court to file findings and conclusions
relating to the computation of the $6450 awarded to Unique and the Skinners in the judgment. 
Findings and conclusions relating to possession of the realty were not required to be filed because
that issue cannot be raised on appeal. See Tex. Prop. Code Ann. § 24.007 (Vernon Supp. 1992)
(providing that the issue of possession cannot be raised on appeal once a county court enters a
judgment in a forcible-detainer action involving non-homestead realty). The findings and
conclusions were filed, and we now proceed as if the error had not occurred. See Tex. R. App.
P. 81(a). Point one is overruled.
      On May 4, 1990, Unique granted Chem-Crete a one-year option to purchase the real estate
on which Unique's manufacturing facility is located:
During the option period and so long as [Chem-Crete] continues to use [Unique's] facility,
[Chem-Crete] shall pay to [Unique] a monthly amount of [$1,350.20]. . . . If, for any reason,
[Chem-Crete] elects not to exercise the option prior to expiration of the option period, such
option shall terminate and be of no force and effect, and thereafter [Chem-Crete] shall pay
over to [Unique] monthly lease payments in the amount of [$1500] for so long as [Chem-Crete] shall elect to use such facilities.
These facts are either uncontroverted or explicitly included in the court's findings:
      •    Chem-Crete intended to exercise the option on June 19 when it notified Unique by letter
that it would "exercise" the option by September 17.
      •    Chem-Crete intended the period between June 19 and September 17 to be for closing the
purchase of the property.
      •    On August 7 Chem-Crete notified Unique's bank that the option would not be exercised
"at this time" but that it would continue to lease the premises.
      •    Chem-Crete thereafter remained in possession of Unique's facilities through the trial.
      •    Chem-Crete continued to pay $1,350.20 a month until Unique refused to accept the
January 1991 payment on January 1 and thereafter did not pay any rent for use of the
facilities.
      Chem-Crete and Al-Rashed contend in point two that the court ordered an excessive amount
paid into the registry. They insist that Unique was never entitled to $1500 a month because the
option was still unexercised at the time of trial in April 1991. According to their calculation, the
court should have awarded the plaintiffs only $5,400.80 ($1,350.20 x 4 months) for January
through April 1991.
      The pivotal question is whether Chem-Crete exercised the option on June 19, as the court
found. If so, its exercise created a binding contract of sale between the parties on that date. See
Sinclair Refining Co. v. Albritton, 14 Tex. 468, 218 S.W.2d 185, 188 (1949). Logically, the
option period and the option would have expired upon its exercise, and the parties' obligations
would then have been governed by the contract of sale.
      However, if the option were not exercised on June 19, then it would have legally continued
until Chem-Crete either elected not to exercise it during the option period or the period for its
exercise expired. Under this scenario, the important question would then be whether Chem-Crete
elected not to exercise the option in the August 7 letter.
      When, as here, a contract does not specify how the option will be exercised or, if exercised,
the time for closing the purchase, the option holder need only give notice within the option period
of the present intent to exercise it and then tender performance within a reasonable time. See
Maxwell v. Lake, 674 S.W.2d 795, 798 (Tex. App.—Dallas 1984, no writ). A fact question can
exist on whether the optionee has signified to the optionor by actions or words a present intention
to exercise an option. Austin Presbyterian Theological Sem. v. Moorman, 391 S.W.2d 717, 720
(Tex. 1965), cert. denied, 382 U.S. 957, 86 S. Ct. 434, 15 L. Ed. 2d 361 (1965). 
      The court found that Chem-Crete exercised the option on June 19 and that the period between
its exercise and September 17 was for closing the sale between the parties. Chem-Crete concedes
that, to accommodate the Skinners, it notified their bank on June 19 of its "intent" to exercise the
option and that it "purportedly" exercised the option on that date. The June 19 letter, however,
leaves Chem-Crete's then "present" intention unclear and ambiguous—perhaps intentionally. Was
Chem-Crete giving present notice of its future intent to exercise the option or notice of its present
intent to exercise the option, with the transaction to be closed by September 17? Because
reasonable minds could differ, a fact issue existed on whether Chem-Crete intended the June 19
letter to signify a present intent to exercise the option. See id. Considering the evidence that
Chem-Crete wanted to aide the Skinners by purporting to exercise the option and the ambiguous
language in the notice letter, the implicit finding that Chem-Crete intended the June 19 letter to
signify a present intent to exercise the option is supported by legally and factually sufficient
evidence.
      As already noted, exercise of the option created a binding contract of sale between the parties. 
See Albritton, 218 S.W.2d at 188. The option period thus terminated on June 19. Did the parties
intend that Chem-Crete would begin paying $1500 a month when it terminated due to the option's
exercise? This question will be answered by applying the rules that govern the interpretation of
contracts.
      The intent of the parties must be determined from the language of the document. See Smith
v. Liddell, 367 S.W.2d 662, 665 (Tex. 1963). That they intended Chem-Crete to pay $1,350.20
a month during the option period and $1500 a month after it expired is clear from the plain
language of their agreement. The problem lies, however, in their failure to specify the amount
to be paid if the option were exercised or if the option period terminated other than by Chem-Crete
electing not to exercise the option within one year.
      Contract provisions may be implied when they are indispensable to effectuate the parties'
intent and the purpose of the contract as a whole. Freeport Sulphur Co. v. American Sulphur
Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 1041-42 (1928). To carry out their intent here, we
must imply an obligation on Chem-Crete's part to pay Unique $1500 a month for the use of the
facilities from June 19. This result is consistent with the parties' clearly expressed intent that the
greater amount would be payable if the option period expired. Moreover, this comports with the
rule that a contract is to be interpreted most stringently against the party who drafted it—in this
instance, against Chem-Crete. See Rep. Nat. Bank v. Northwest Nat. Bank, 578 S.W.2d 109, 115
(Tex. 1979). 
      Chem-Crete, however, continued paying Unique only $1,350.20 a month until Unique refused
to accept the January 1991 payment. It then ceased paying rent but continued to occupy Unique's
facilities. The June 1990 payment must be prorated to June 19 at the rate of $1,350.20 and at the
rate of $1500 for the remainder of that month. Based on the proration, the total due for September
was $1,405.19. Having paid only $1,350.20, Chem-Crete owed an additional $54.99 ($1,405.19 -
$1,350.20 = $54.99) for September. Unique was also entitled to an additional $449.40 ($1500 -
$1,350.20 = $149.80 x 3 = $449.40) for October through December 1990, when the plaintiffs
refused to accept any more payments at the lower rate. Finally, Unique was entitled to recover
$6000 ($1500 x 4 = $6000) for January through April 1991. The court could have ordered
$6,503.39 ($54.99 + $449.40 + $6000 = $6,503.39) paid into the registry instead of only
$6450. Accordingly, the amount ordered paid into the registry is not excessive, and point two is
overruled.
      Point three, that Unique waived rental payments for January through April 1991 when it
refused to accept the $1,350.20 payment tendered on January 1, is without merit and likewise
overruled. We affirm the judgment.
 
                                                                                     BOB L. THOMAS
                                                                                     Chief Justice

Before Chief Justice Thomas,
      Justice Cummings, and
      Justice Vance
Affirmed
Opinion delivered and filed May 20, 1992
Do not publish