[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 10511
The plaintiff in this action, Wilcox Trucking, Inc. (Wilcox), alleged in its complaint dated October 13, 1989 that "from September 26, 1986, and continuing until August 1, 1988, . . . at the request of and for the benefit of defendant, [the plaintiff] delivered topsoil, loam, gravel and sand" to certain tracts of land which were being developed by the defendant, First Hartford Realty Corporation (FHRC), in the towns of Manchester and Vernon, and that it also removed and disposed of stumps, hauled gravel and rented earth moving equipment to the defendant in connection with its development of those projects.
The defendant, in its answer to the complaint, denied that it owed the sum of $117,991.60 as claimed by Wilcox and also filed a counterclaim in which it alleged that the parties had "entered into an agreement in which FHRC agreed to sell and Wilcox agreed to buy surplus gravel removed by Wilcox" from one of the projects known as "Manchester Industrial Park III" (MIP III) located on Utopia Road in Manchester. The defendant also alleged that the agreement provided that Wilcox would pay fifty cents per cubic yard for the surplus gravel removed from MIP III and that pursuant to the agreement approximately 301,375 cubic yards of gravel were removed by Wilcox from June, 1986 to August, 1988 for which FHRC had not been paid.
In the first three counts of the defendant's counterclaim, damages in the amount of $150,925.00 were claimed by FHRC by reason of Wilcox's removal of the surplus gravel, based on the plaintiff's breach of the agreement, and on theories of unjust enrichment and quantum meruit. Counts four, five and six of the counterclaim originally filed by the defendant alleged that the agreement between the parties also provided that Wilcox was to bring the grade of the lots in MIP III to one-tenth of a foot of the proposed grades as shown on the plans which were given to him by FHRC, that "approximately 44,347 cubic yards of non-surplus material" had been improperly overexcavated, and that FHRC was entitled to damages based on theories of fraudulent concealment and unjust enrichment.
When the case was reached for trial the parties stipulated to a judgment in favor of Wilcox on the complaint for $117,991.60, and also filed an agreed statement of facts pertaining to the issues raised in the defendant's counterclaim. CT Page 10512 The stipulation of facts included a list of 29 dates from September 1986 to August 1988 which they agreed were the only times that Wilcox removed material from, or delivered material to, MIP III for the benefit, or at the direction of FHRC.
The stipulation also stated that the daily work reports of FHRC during the period in question would be introduced as business records and listed sixteen other dates on which Wilcox did not move or was not likely to have moved material from MIP III, as well as seven days when Wilcox did not remove any material except "as shown on the daily work reports." As a part of the stipulation the parties also stated that "[a]s to the remaining 120 dates for which daily work reports exist, there remains a dispute as to whether Wilcox Trucking was performing any work on MIP III other than reflected on the daily work reports."
At the conclusion of the evidence, the court allowed FHRC to revise its counterclaim by deleting the fourth, fifth and sixth counts and by adding a new paragraph (para. 7) to the first count, in which it alleged that it was entitled to an additional sum by way of damages for the cost of moving and relocating the remaining surplus material because of Wilcox's failure to grade the lots as required by the agreement.
The plaintiff's answer to the revised counterclaim stated that it admitted entering into "an agreement in which FHRC agreed to sell and Wilcox agreed to buy surplus gravel [to be] removed by Wilcox from certain real property . . . and that the unit price for said surplus gravel removed by Wilcox would be 50 cents per cubic yard." Wilcox also asserted by way of special defenses that 1) the first count was barred by the statute of frauds, 2) any overexcavation was the result of improper information provided to Wilcox by FHRC, 3) Wilcox did not remove any surplus material for its own benefit, 4) FHRC breached the verbal agreement by selling the gravel to someone else and after Wilcox learned of that sale and had informed FHRC "that there was no longer an agreement", the parties operated thereafter under "verbal barter agreements" in which Wilcox performed services for FHRC's benefit "in exchange for certain amounts of gravel", and 5) FHRC "made material changes to the proposed final grades on Lots 1, 2 and 3 of the premises, thereby depriving Plaintiff of the benefit to which it was entitled pursuant to the alleged June, 1986 verbal agreement."
CT Page 10513 The principal witness for the defendant in the course of the trial of the issues raised by the counterclaim was Michael Sweeney, the purchasing agent for FHRC, who was authorized by the corporation to solicit bids and to negotiate and administer contracts on its behalf. The negotiation and performance of the agreement which was the basis for the judgment entered by stipulation on the plaintiff's complaint, and the negotiation of the oral agreement which is the subject of the counterclaim, were conducted exclusively between Sweeney and David Wilcox, who is the sole owner of the plaintiff corporation and was its principal witness at the trial.
The defendant first offered into evidence the invoices (Exhibit 1) and the purchase orders (Exhibit 2) which were the basis for the stipulated judgment of $117,991.60 entered in favor of Wilcox in payment for the services it provided for the benefit of FHRC from September 26, 1986 and continuing until August 1, 1988 as stated in the plaintiff's complaint. It is undisputed that those services were performed during that period in connection with the development of MIP III, an industrial park located on Sheldon Road in Manchester consisting of twelve separate lots and a roadway known as Utopia Road.
Sweeney testified that the property was owned by Somersville Corporation, the development arm of First Hartford's corporate organizational structure, and that at the time of its acquisition it was an undeveloped forty-five acre former gravel pit that had not been used for a long period of time. He also stated that about 100,000 cubic yards, or one-third of the total available sand and gravel as estimated in June of 1986 by Fuss 
O'Neill, FHRC's engineering consultant, had been previously excavated and were stockpiled in various locations on the twelve lots of the proposed MIP III development.
Sweeney also testified that early in June of 1986, he and Stuart Greenwald, the treasurer of Somersville Corporation, agreed that the proceeds of the sale of surplus gravel on the property were to be given to FHRC as compensation for its management services in the development of MIP III. Greenwald was also called as a witness to corroborate the claim that such an agreement had been made and that therefore FHRC would be "entitled to any benefits to be realized" from the sale of sand and gravel as alleged in each of the three counts of the defendant's revised counterclaim.
CT Page 10514 In the course of his testimony as a witness called by FHRC, Wilcox stated that when he became aware of the fact that there was a "tremendous amount of gravel" on the MIP III site he went to Sweeney "and proposed that I would like to buy the gravel in the hills." Transcript, testimony of David R. Wilcox, p. 45. Thereafter, Sweeney gave Wilcox a report from Fuss O'Neill, an engineering firm, that estimated the total amount of surplus material left on the site to be 276,932.60 cubic yards based on the grades required by the plans that had been approved, and also gave a breakdown of the estimated amount of surplus material for each of the twelve lots and the proposed roadway.
Wilcox also testified that the Fuss O'Neill report dated June 27, 1986 which had been introduced in evidence as Defendant's exhibit 5 was the same document Sweeney gave him when they agreed on a price of 50 cents per yard for the surplus sand and gravel. He stated that in accordance with the usual custom and usage of the trade, where unexcavated sand and gravel is purchased the parties negotiate the quantity of material on an "in place" basis rather than allowing for a "swell factor" for the expansion of excavated material as would be the case where such material is being sold after excavation.
Wilcox stated that although they had verbally agreed on everything and there were no other terms to be negotiated, he asked Sweeney to reduce their agreement to writing, and he also identified an undated, unsigned document (Defendant's exhibit 9) as the one that was given to him at his request but which he never signed and which Sweeney never insisted that he sign at any time thereafter. Exhibit 9, which Wilcox stated appeared to include the terms of the agreement except for the disputed 25% swell factor (Transcript, p. 256), contains a provision for the release of one lot at a time to the buyer and also states that the quantities estimated by Fuss O'Neill on each lot "will be the determining factor in establishing payment."
Wilcox testified (Transcript, p. 265) that the oral agreement was later abandoned by mutual consent and that the "one thing" that made him decide that there was no longer any agreement was when Sweeney told him that the surplus material on Lot 10 consisting of almost 33,000 cubic yards of sand and gravel was going to be sold to another buyer, Mitchell Trucking Company. He stated that he had been negotiating with another party, Manchester Sand Gravel, for the material on Lot 10 and had expected to sell it at a price of between $3.50 and $3.75 CT Page 10515 per cubic yard.
Although he acknowledged that he had no legal right to stop a sale of material to another buyer, he felt that Sweeney "broke the agreement that we had in the beginning that I should have all the material and grade the lots." Transcript, p. 72. At a later point in his testimony (Id. at 272), Wilcox stated that as a practical matter it would not have been in his best interest at that time for him to make an issue about the loss of the material on Lot 10 because there were still "200,000 [yards] left [and there was] plenty more here for all of us."
In the course of his cross-examination as an adverse witness by counsel for FHRC, Wilcox was questioned about his claim that he never performed in accordance with the oral agreement based on his responses to interrogatories put to him by the defendant during pretrial discovery. In response to one interrogatory as to whether he had performed grading work on the MIP III lots in accordance with the engineering drawings that he was given he stated that he had done the grading "in strict accordance" with those drawings, but in his trial testimony he stated that the "only one I really graded was [Lot] eleven." Transcript, p. 136.
In response to another interrogatory he denied that he had any invoices showing sales of sand and gravel to any third party during the time that he was working on MIP III. Transcript, p. 167. After being questioned by opposing counsel about his answer to that question he admitted that it was false but that any sales that were made to others were of material excavated from Lot 4 only. Id. 169.
Wilcox stated that although he could not verify it from his own records, the amount of material removed from Lot 4 for his own benefit as part of what he claimed was a "swap deal" in exchange for his services, was 12,000 cubic yards of sand and gravel. Transcript, p. 283. He also testified that he never took any gravel for resale without Sweeney's permission but that he never kept track of the amount taken and that the total amount could not be calculated because there was no record kept by either party of the volume of surplus material that was removed. Id. pp. 144-45.
He attributed the failure of both parties to keep accurate records of the amount actually excavated and removed from the CT Page 10516 premises to the fact that no money was changing hands and that "[i]t was a mutual agreement and we trusted each other, and I trusted Sweeney a hundred percent." Id. 228. He also acknowledged that he had "high respect" for him and that he was a person of honesty, integrity and "good credibility". Id.
Sweeney's testimony about the negotiations that led up to the verbal agreement for the sale of the surplus sand and gravel was generally consistent with the account given by Wilcox. However, it was Sweeney's recollection that the discussions between them over a period of weeks, culminated sometime in the latter part of August, 1986 in a meeting of the minds of both parties on all of the essential terms of the agreement, and that those terms included a twenty-five percent "swell factor" that had been a subject of their negotiations contrary to Wilcox's testimony that the quantity was to be determined on an "in place" basis.
Sweeney stated that "there were three modifications to that agreement" due to certain unforeseen circumstances that arose later in the course of the development of MIP III, and that after "each modification there was a renewed acceptance" by Wilcox. Partial Transcript, testimony of Michael Sweeney, pp. 45-46 (hereinafter referred to as PT). The first of these changes, based on his review of the daily reports, occurred in November, 1986, when he found it necessary to remove surplus material from Lot 10 to allow the construction of a warehouse which was to be built on that lot. Id. 47.
He said that Wilcox was busy on Lot 7 which was being developed at the same time and when he was offered the opportunity to remove the gravel pursuant to the contract he told Sweeney he was too busy to do it because he was "hauling gravel for his own use [from Lot 7] and excavating gravel on the road for his own use" as well. Id. 47. Sweeney testified that he then entered into an agreement with another contractor, Mitchell Trucking Company, on the same terms as the existing agreement with Wilcox, including the 25% swell factor, for removal of the sand and gravel on Lot 10, and that the sale to Mitchell was the only sale of surplus material that was made to anyone other than Wilcox. Id. 48, 54.
The second unforeseen circumstance according to Sweeney, was when he learned that a First Hartford residential project in Vernon, known as Briar Knoll, required additional quantities of CT Page 10517 sand and gravel to bring it up to the required grades, and Wilcox, at Sweeney's request, hauled 12,512 cubic yards of material from Lot 2 to Briar Knoll for the benefit of FHRC for which Wilcox was paid under the invoices as stated in the stipulation of facts. PT, pp. 56-59. The other deviation from the oral agreement occurred later on in the course of the project when Wilcox, rather than Fuss O'Neill, assumed the responsibility for providing the grades so that the work could proceed more quickly.
Another reason given by Wilcox for what he claimed was a mutual abandonment of the oral agreement was the fact that an out of state development company that was owned by First Hartford was brought in to work on the roadway and to excavate the sand and gravel which was to have been sold to Wilcox based on the Fuss O'Neill report upon which the parties relied under the agreement. Sweeney identified the company as W. J. Sons (PT p. 136) and stated that it was responsible only for the installation of utilities in the roadway and that its activities, according to Sweeney, did not in any way reduce the amount of material available to Wilcox for excavation and removal pursuant to the agreement.
The defendant offered FHRC's daily reports through Sweeney as business records in accordance with the stipulation in order to show that Wilcox's presence at the job site for almost 100 days out of the total of about 145 days shown on the reports could only have been for the purpose of hauling away material under the agreement, particularly in view of the fact that Wilcox stated that he was at MIP III for about 90% of the time alleged in his complaint as being the period in which he was performing work under the purchase orders. Evidence was also offered to show that Wilcox never made demand for the amount admittedly due him under the complaint and that he never responded to a letter by FHRC dated November 23, 1998 that stated that only $17,000 was due him.
The very first daily report that refers to Wilcox was dated September 2, 1986 and indicated that Wilcox was hauling "excess gravel off site" from the roadway. In the absence of a purchase order for that day, Sweeney interpreted that entry to mean "that [Wilcox] was performing under our oral agreement and that he was working." Transcript, p. 78.
There was also evidence to show that the provision of the CT Page 10518 unsigned agreement prepared by Sweeney (Defendant's exhibit 9), that only one lot at a time was to be released to Wilcox, and that all work was to be completed on that lot before starting work on another lot, was being followed by the parties during the development of MIP III. Sweeney also testified that as far as he was concerned, once a lot was released to Wilcox "that gravel [belonged] to him and he [had] possession of that soil and [was] required to remove it and put it on grade." Transcript, p. 95.
Sweeney also testified that he personally observed activity by Wilcox attributable to and consistent with the performance of his obligations under the oral agreement on days for which there were no daily reports that noted such activity. Id. 108. He also stated that it was his recollection that he witnessed activity consistent with the performance of the agreement on all of the lots except for Lot 10. Id. 109.
The defendant also offered in evidence two engineering reports, the first dated August 2, 1991 (Exhibit 6) and the second dated April 13, 1992 (Exhibit 7), which were furnished by Fuss O'Neill at the request of counsel for FHRC. Exhibit 6 stated that field checks of Lots 4, 5 and 6 showed that they had been overexcavated, and Exhibit 7 gave the results of a field check of "the final grades for the subdivision against the proposed grades of the approved plans."
The second report gave a lot by lot breakdown of the amount of excess material that had been removed and concluded that "[t]he actual amount of excess material removed from the site is therefore approximately 241,100 cubic yards." Christopher Stone, a civil engineer and a member of the firm, testified that the computer method used for the 1992 calculation was more accurate than the "double end" method which was used for the 1986 calculation of approximately 270,000 cubic yards.
He stated that the earlier report which was relied on by the parties in their agreement was "much more approximate [and] had a larger range of variance" but that any such estimate has a margin of error of plus or minus ten to fifteen percent. Transcript, pp. 5, 6. He also gave his opinion in response to a hypothetical question that under circumstances similar to those in this case, although it is not an exclusive or absolute practice, "it is typically customary to agree on a price in place without a swell factor." Transcript, p. 24. CT Page 10519
The plaintiff's first claim as stated in its first special defense is that the cause of action alleged in the first count of the defendant's counterclaim is barred by the statute of frauds because it is based on an oral agreement for the transfer of an interest in land. Where an agreement for the sale of sand and gravel provides that the buyer is to excavate and remove the material from the seller's land, the alleged agreement must conform to the statute of frauds because it constitutes the transfer of an interest in land. DeLuca v. C. W. Blakeslee 
Sons, Inc., 174 Conn. 535, 541.
In DeLuca, the plaintiff seller claimed that there had been part performance of the agreement sufficient to take it out of the statute because he had permitted the defendant to take possession of the premises "for the purpose of removing stumps and brush on the land preliminary to commencing excavation . . . ." Trial Court's Memorandum of Decision, Vol. A-652, Recs. Briefs, Nov. Term, 1977 at p. 33. The trial court held that preliminary work of that kind did not constitute a delivery of possession to the buyer. Id. 34, 73.
Under the facts of this case, however, it is undisputed that possession of each of the lots was delivered by the seller to the buyer and that by the buyer's own admission at least some material was in fact excavated. The actual removal of earth and minerals is a sufficient performance of an agreement to take it out of the statute of frauds. New Haven v. Hotchkiss, 77 Conn. 168,174. It has also been held in such cases that where the seller has alleged that the fill material has been removed and all that remains to be done by the buyer is to pay for it, the statute does not apply. Bell v. Hill Brothers Construction Co.,419 So.2d 575 (Miss. 1982) Accordingly the court finds that the cause of action alleged in the first count of the counterclaim is not barred by the statute of frauds.
Wilcox has also argued that the statute of frauds bars the oral agreement between FHRC and Somersville Corporation under which the proceeds of any sales of sand and gravel were to be given to FHRC. This claim is also without merit because a stranger to an oral contract cannot avail himself of the fact that the statute of frauds may render the contract unenforceable. Bulkley v. Storer, 2 Day 531; see also Gracie Tower Realty Associates v. Danos Floral Co., 538 N.Y.S.2d 680,683 (City Ct. 1987). CT Page 10520
The plaintiff's fourth special defense alleges that FHRC "breached the alleged verbal agreement by selling the gravel to another entity," and that when Wilcox found out about it he "informed [FHRC] that there was no longer an agreement." The issue raised by that defense is whether the parties mutually agreed to what Sweeney referred to as "modifications" of the agreement, or whether the agreement was abandoned or terminated by the parties.
The parties to an agreement may validly agree to substitute or materially change it by mutual consent, but they must "assent to the same thing in the same sense [citations omitted] if they are to vary the contract in any way after it has been executed." Hess v. Dumouchel Paper Co., 154 Conn. 343 at 347. Where a claim is made that a prior contract has been modified, the party asserting the modification must show that there was mutual assent to its meaning and conditions based on the surrounding circumstances and the conduct of the parties. First Hartford Realty Corp. v. Ellis, 181 Conn. 25, 33.
One party to a contract cannot purport to cancel it unilaterally, and then continue to accept its benefits. Woodbridge Ice Co. v. Semon Ice Cream Corp., 81 Conn. 479,483-84. A contract will be deemed to have been abrogated where the court finds that the subsequent actions and conduct of the parties were clearly outside the scope of their existing agreement and that neither party acted to enforce or to perform their respective contractual obligations. Yale Cooperative Corp. v. Rogin, 133 Conn. 563, 569-70.
The essential theory of the plaintiff's defense and its sole justification for the claim that the parties mutually abandoned the contract is that its essential purpose was frustrated by three actions that were taken by FHRC very shortly after the parties had agreed that all of the surplus material from the twelve lots and the roadway were to be made available to Wilcox for resale. The first of these, according to Wilcox, was FHRC's decision to have W. J. Sons install the roadway, the second, the sale by FHRC of the approximately 33,000 cubic yards of sand and gravel that Fuss O'Neill estimated as being available from Lot 10 to Mitchell Trucking, and the third, its decision to remove 12,512 cubic yards of material from Lot 2 to Briar Knoll for FHRC's own benefit.
CT Page 10521 The daily reports introduced in evidence by FHRC that refer to work being done on Utopia Road from September through December 31, 1986, show that Wilcox, contrary to his testimony at the trial, was removing and hauling material and cutting and grading the roadway during that period in preparation for the installation of "underground piping" by W. J. Sons. They also show that he continued to cut and grade the road until it was completed on January 14, 1987.
Sweeney's testimony as to the reasons he contracted with Mitchell Trucking to work on Lot 10 is also corroborated by the daily reports for December, 1986 which show that Wilcox was behind schedule, and that as of December 23rd it was noted that "[Wilcox] cannot meet our demand at the present time, especially with the amount of work on Lot #10." The report of December 23rd notes that "Mr. Wilcox seemed very concern (sic) about Lot #10 after he was informed by his employee that Mitchell Trucking was on the job today", but that by January 6th he had "[cooled] down, and seems very willing to start another lot", and as of January 9th there was a "big improvement" in his work since Mitchell had taken over Lot 10.
The delivery of surplus material to Briar Knoll was clearly a proper modification of the agreement in that it was "fair and equitable in view of circumstances not anticipated by the parties when the contract was made." Restatement (Second) of Contracts 89. In any event, Wilcox can hardly deny that he assented to the change when the record establishes that he hauled the material at FHRC's request and at its expense pursuant to his own invoices.
A parol modification of a contract agreed to by the parties is proper where the original agreement was not in writing and the parties to such an agreement may vary its terms by a subsequent course of dealing. 17A Am.Jur.2d 526. The fact that the party who denies liability under the agreement as modified, on the ground that he would have realized a greater profit under the original agreement, does not justify its termination based on a claim that the purpose of the agreement has been frustrated. Wooldridge v. Exxon Corporation,39 Conn. Sup. 190, 193-94.
Where the evidence presented comes principally from the two contracting parties, the court must determine which party's reconstruction of the facts is more accurate. Harris Calorific CT Page 10522 Sales Co. v. Manifold Systems, Inc., 18 Conn. App. 559, 564. After reviewing all of the testimony offered by both parties, the court finds that the testimony of Michael Sweeney is more credible than that of his counterpart, David Wilcox, and is corroborated by the documentary evidence as well as by the credible testimony given by all of the witnesses called by both parties.
For the foregoing reasons, the court finds that the defendant has sustained its burden of proving that the plaintiff is liable to the defendant on the agreement alleged in the first count of the counterclaim.
The court also concludes that in spite of the testimony given by Christopher Stone that it was "typically customary" for parties negotiating sales of sand and gravel to negotiate the price in place without a swell factor, the parties negotiated a swell factor as a part of their agreement. The court finds that a swell factor of 25% was agreed upon by Wilcox because of the economic advantages that would accrue to him by accepting Sweeney's demand for that particular term as a condition of the agreement.
The trier of fact, in determining the amount of damages for the breach of a contract for the excavation and removal of earth or minerals, need not do so with mathematical certainty or beyond doubt, but only upon evidence sufficient to enable it to make a fair and reasonable finding as to damages. Anvil Mining v. Humble, 153 U.S. 540 (1894). Once the breach of a contractual obligation with resulting damage has been established, the mere uncertainty as to the exact amount of damages will not preclude the right to a recovery, and the evidence need show only the extent of the damages as a matter of just and reasonable inference even though the result may only be approximate. General Finance Corp. v. Dillon, 172 F.2d 924
(10th Cir. 1949).
The court finds that on the basis of the most recent Fuss 
O'Neill report (Defendant's exhibit 7) and the testimony of Christopher Stone, the amount of excess material moved from MIP III pursuant to the agreement was approximately 241,100 cubic yards. Based upon the contract price of 50 cents per yard, the total amount due FHRC is $120,550.00.
Wilcox is entitled to a credit of $5,630.40 for the sand CT Page 10523 and gravel that it hauled to Briar Knoll (12,512 cubic yards loose measurement) reduced to its "in place" volume by Fuss 
O'Neill's 10% swell factor, or 11,260.80 cubic yards at 50 cents a yard. The net balance due is $114,919.60, to which the 25% contractual swell factor is added for a total of $143,649.50.
Although evidence was offered through Fuss O'Neill and other witnesses that some of the lots were overexcavated and a claim was made for damages in paragraph 7 of the first count of the revised counterclaim, the court finds that FHRC has not sustained its burden of establishing that it is reasonably certain that FHRC has sustained or will sustain such damages. Neiditz v. Morton S. Fine Associates, Inc., 2 Conn. App. 322,328. In any event, the overexcavation of lots in a subdivision is considered to be a permanent injury to the realty which can only be established by the owner through proof of the difference in value of the property before and immediately after the improper grading was done. Klein v. Garrison, 108 N.E.2d 381
(Ohio App. 1951).
For the foregoing reasons, and based on the parties' stipulation for judgment on the complaint, judgment is entered as follows:
Judgement is entered in accordance with the stipulation of the parties in favor of the plaintiff on its complaint against the defendant in the amount of $117,991.60.
Judgment is entered in favor of the defendant on the first count of its counterclaim against the plaintiff in the amount of $143,649.50.
Hamer, J.